DREW, J.
 

 |, Ray Anthony Sinclair was convicted of second degree murder and sentenced to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. He now appeals. We affirm in all respects.
 

 FACTS
 

 In the early evening of July 19, 2001, Charles Smith was violently attacked in the small store he operated next to his Arcadia home. A neighbor, Lenest Roberson, saw the defendant leaving Smith’s store. As she approached the store, she began screaming when she saw Smith bleeding profusely from his head. Another neighbor, Mary Wilks Kilgore, heard the commotion, and could see Smith holding his head. She called 9-1-1 while Roberson stayed with the victim. She then joined Roberson and Smith, asking him who had hurt him. Smith identified his assailant only as the grandson of Mary Louise Sampson. This defendant is her grandson.
 

 The victim was transported to Lincoln General Hospital by paramedics where he was treated by Dr. Benson A. Grigsby for approximately two hours. During his treatment, Dr. Grigsby determined that Smith had suffered blunt force trauma to the head, resulting in the fracture of most of his facial bones. Because of the severity of the injuries and the limited capabilities of Lincoln General Hospital, Dr. Grigsby had Smith transported to LSU Health Sciences Center in Shreveport. Just before arriving at LSU, Mr. Smith suffered a cardiac arrest and registered no vital signs. The trauma team at LSU was able to resuscitate him, but he never regained consciousness or cognitive function. He underwent a tracheotomy 12to facilitate breathing on a ventilator and for the insertion of a percutaneous endoscopic gastros-tomy (PEG) tube into his stomach for feeding with liquids. His demolished left eye was surgically removed.
 

 Two weeks later, Smith was transferred to the Health South Rehabilitation Hospital in Ruston, where he remained in a vegetative state until his discharge on October 11, 2001, to the Town and Country Nursing Home in Minden, Louisiana. Seven days after arriving at the nursing home, Smith developed pneumonia and was admitted into the Minden Hospital, where he died on October 27, 2001. According to Dr. Frank Peretti, a forensic pathologist, Smith’s death was the result of “multiple medical complications” related to the attack.
 

 Michael Wright, a member of the Arcadia Police Department, was the first officer on the scene and had been able to briefly speak to the victim before his departure by ambulance. Wright indicated that the victim had identified his assailant only as Mary Louise’s grandson, but that other witnesses claimed he had specifically identified the defendant.
 

 Early on July 20, 2001, Sinclair turned himself in. He was booked by Gary
 
 *49
 
 White, an officer with the Arcadia Police Department, who read Sinclair a
 
 Miranda
 

 [1]
 

 rights form. Sinclair signed the document, confirming his understanding of his rights, and indicating that no pressure, promises, threats, or inducements had been applied. No interrogation followed at that time.
 

 | sHours later, Deputy Randy Price of the Bienville Parish Sheriffs Office interviewed Sinclair, first explaining to him his rights. Sinclair provided a written exculpatory statement, denying having been in the store on the date of the attack.
 

 Arcadia Chief Victor Rogers, and Arcadia Police Officer Wright, testified that they interviewed Sinclair on the morning of Monday, July 23, 2001. Both testified that Chief Rogers recited Sinclair’s rights to him, that he understood and waived them. They also denied that any promises or threats were made to Sinclair in an effort to coerce a statement. Both officers testified that at this time there was no discussion of the crime’s penalties. Sinclair admitted his involvement in the crime. Rogers terminated the interview and advised Price that Sinclair was ready to give a statement.
 
 [2]
 

 Price explained
 
 Miranda,
 
 after which Sinclair signed a rights form acknowledging his understanding of those rights, and his willingness to proceed. Sinclair confessed, admitting beating Smith with his hands and then with a pistol.
 

 On January 31, 2002, a Bienville Parish Grand Jury indicted Sinclair for the first degree murder of Charles Smith, alleging a crime date of July 19, 2001.
 

 |4On January 27, 2003, Sinclair filed a motion seeking appointment of a sanity commission. Following a sanity hearing on August 19, 2003, the trial court determined that Sinclair was competent to stand trial.
 

 On December 7, 2004, Sinclair filed a motion to suppress the statements given by him on July 20 and 23, 2001. The motion came for hearing on January 11 and 17, 2006.
 

 After hearing the testimony, defense counsel conceded that Sinclair had no basis for seeking exclusion of the July 20, 2001, written statement since he had been properly advised of his rights and the statement was not inculpatory.
 

 As to the July 23, 2001, confession, the trial court found that Sinclair’s confession was lawful, predicated upon the testimony of Rogers and Wright, as well as defendant’s own signature on the rights form. Accordingly, the trial court denied the motion to suppress.
 
 [3]
 
 At the conclusion of the hearing and after consulting with counsel, the court set the matter for trial on May 15, 2006.
 

 This trial date somehow went away, and on March 30, 2006, the state filed a motion and order setting the matter for trial on August 21, 2006. On July 26, 2006, the trial court granted Sinclair’s motion for a continuance.
 

 
 *50
 
 ■ On January 29, 2007, the state sought and obtained another order setting the matter for jury trial, this time on May 21, 2007. Defense counsel filed yet another motion to continue the trial. The trial was reset for August 13, 2007.
 

 |sOn May 30, 2007, Sinclair filed a letter in the district court informing the court that he had “fired” his counsel, Joseph Clark, for ineffectiveness. The letter also informed the court he could not afford retained counsel and asked that new counsel from the Indigent Defender’s Office be appointed to represent him. On June 11, 2007, Sinclair filed a
 
 pro se
 
 motion to quash the prosecution for the state’s failure to abide by the time limitations for commencement of trial after institution of prosecution. Judge Fallin denied the motion that same date on the basis that he would not entertain
 
 pro se
 
 motions so long as the defendant had counsel of record.
 

 On the same day he denied the motion to quash, Judge Fallin issued an order setting a hearing for July 10, 2007, on the defendant’s request to terminate counsel. At the hearing, the court was informed by defense co-counsel, Clay Carroll, that Sinclair had agreed that Carroll would handle the guilt phase of the case and Clark would handle the sentencing phase, should there be one. Sinclair then withdrew his motion to terminate Clark.
 

 On February 19, 2008, the court once again set the matter for jury trial, this time on June 16, 2008. On March 4, 2008, the state amended the indictment to reduce the charge to second degree murder. On the day trial was set to commence, defense counsel filed a motion to continue and a motion to quash on the basis that the state .failed to timely commence trial after the institution of prosecution. The trial date was continued and the motion to quash came for hearing on July 9, 2008. After argument by counsel, the trial court found that the time limitation for commencing trial had not run and denied the motion to quash.
 

 IfiThe jury trial was then rescheduled twice, first on September 15, 2008, and then on February 17, 2009, each trial date later being continued at the defendant’s request. Sinclair was finally tried before a jury on September 21 through 24, 2009. After hearing all the evidence, the jury found Sinclair guilty of second degree murder.
 

 Sinclair filed motions for post-verdict judgment of acquittal and new trial, both of which were denied. Sinclair was sentenced on November 4, 2009, to life imprisonment at hard labor without benefits. This appeal followed.
 

 DISCUSSION
 

 Did the trial court err in not granting defendant’s motion to quash, which motion was based upon the state’s alleged failure to timely commence trial?
 

 Argument
 

 Sinclair argues that the trial court erred in considering two of his actions as “preliminary pleas,” which served to suspend the time limitations found in La. C. Cr. P. art. 578.
 
 [4]
 

 Sinclair argues that a defendant’s efforts to secure counsel do not toll the time limitations of La. C. Cr. P. art 578. In addition, while motions to quash do customarily suspend the time limitation, his motion was not considered on its merits and thus could not have legitimized a delay in prosecution.
 

 
 *51
 
 The state argues only that at no point after the expiration of the three years for bringing Sinclair to trial did more than a year elapse after ^disposition of defense-filed preliminary pleas, each of which interrupted prescription. The state does not argue the merits of whether Sinclair’s
 
 pro se
 
 efforts to terminate his counsel or quash the prosecution should be deemed as preliminary pleas.
 

 Law
 

 Our law on temporal limitations on trial is well settled.
 
 [5]
 

 
 *52
 

 \xAnalysis
 

 The only period at issue in the present case is the one year and one month that elapsed between the trial court’s May 9, 2007, order granting the defendant a continuance of the May 21, 2007, trial date and defense counsel’s filing of motions to quash and for a continuance on June 16, 2008. During this period, the only potential prescription-interrupting events were: (1) Sinclair’s May 24, 2007, filing of a letter informing the court that he had terminated his court-appointed counsel and was seeking the appointment of new counsel, and (2) Sinclair’s June 11, 2007, filing of a motion to quash |9based on the state’s failure to bring him to trial within the delays set forth in La. C. Cr. P. art. 578.
 

 Sinclair argues that neither of these events served to suspend the running of the Article 578 delay. As to the motion to quash, Sinclair concedes that Article 580 expressly identifies such motions as preliminary pleas which interrupt prescription, but argues that because his motion was not considered on its merits and was denied on the same day it was filed, it is an exception to the rule.
 

 The proffered authority for this proposition is
 
 State v. Van Dyke,
 
 03-437 (La.App. 3d Cir.10/1/03), 856 So.2d 187,
 
 writ denied,
 
 03-2777 (La.2/13/04), 867 So.2d 689, though this case actually makes no such assertion. In
 
 Van Dyke,
 
 the defendant was originally indicted on a charge of first degree murder in October of 1996. That indictment was quashed on May 23, 2002, on the basis that one of the grand jurors was not qualified to serve. The defendant was re-in-dieted on a charge of second degree murder, which he sought to quash on the basis of an Article 578 time violation. In granting the motion to quash, the trial court erroneously conducted a review of the elapsed time since the original 1996 indictment, making the following observation:
 

 On March 27th, defendant filed several motions, discovery motion, a Motion for Production of Exculpatory Evidence, and a Motion and Order for Disclosure of Police Report, the initial report. The Code of Criminal Procedure provides suspension of prescription during the time it takes for the Court to rule on these motions. Under Article 580 suspension of time and time limitations where defendant files a Motion to Quash, or other preliminary plea, to run a period of limitation established by 578 shall be suspended until the ruling of the court thereon; but | inin no case shall the State have less than one year after the ruling to commence the trial.
 

 The motions listed above should not be construed as “preliminary pleas” for the purposes of suspension. In addition to the Motion to Quash, Motions for Continuance or for hearings by the defendant are the common examples of
 
 *53
 
 defense actions that bring about suspension under that article. Here a judge signed the order the same day the motions were filed, thus suspension did not occur.
 

 The appellate court reversed the trial court on the basis that the state had two years from the defendant’s re-indictment to bring the defendant to trial, barring any interruption or suspension of the time delay. The appellate court neither agreed nor disagreed with the trial court’s statement about whether the signing of a preliminary plea on the same day that it is filed serves to suspend prescription.
 

 We find no authority that the denial of a
 
 pro se
 
 motion to quash (on the basis that it was not filed or adopted by enrolled counsel) fails to suspend prescription. The trial could not have started with this motion pending.
 

 In any event, this issue is mooted by the substitution of counsel on July 11, 2007, less than two months from the previously continued trial date of May 21, 2007 (a continuance sought by defense counsel). The fact that the matter was resolved on July 11, 2007, and the trial court informed of the resolution on that date, does not change the fact that at least until the request for new counsel was withdrawn, prescription had been suspended and the state had a year to bring the defendant to trial. The state tried to do just that by having the matter set for trial on June 16, 2008, which date was also continued at the request of the defendant.
 

 InA review of the record in this matter clearly indicates that during any periods in which Sinclair did not have a pending motion for a sanity commission, a motion to suppress evidence, or a motion to quash the prosecution, the state consistently moved to set the matter for trial, but all settings were continued at Sinclair’s request. Since all of these filings are preliminary pleas which suspend the running of the time limitation, the state had one year from July 11, 2007, to proceed to trial. La. C. Cr. P. art. 580. The trial commenced timely, and the trial court properly refused to quash the prosecution.
 

 Did the trial court err in not suppressing Sinclair’s July 23, 2001, statement?
 

 Argument
 

 Sinclair argues that the trial court erred in denying the motion to suppress his confession because:
 

 • he had invoked his right to remain silent with two different law enforcement officers before making inculpato-ry statements to Chief Rogers; and
 

 • Chief Rogers never determined whether the right to remain silent was invoked.
 

 The state argues that the defendant mis-characterizes the record and that the defendant never invoked his right to remain silent.
 

 Law
 

 Our law on the admissibility of confessions is well settled.
 
 [6]
 

 
 *54
 

 _[¿2Analysis
 

 The boilerplate motion to suppress raises the claim that the confession was obtained under the “influence of fear, duress, intimidation, menaces, threats, inducements and or promises, and/or without the defendant having been properly advised of his rights to remain silent and to have counsel appointed to represent him, and or without sufficient understanding of his rights in order to make an intelligent waiver of those rights[.]” Neither this motion nor any objection at trial raised the claim that the confession should be suppressed because it was obtained after the defendant had invoked his right to remain silent.
 

 11sThis is a new basis for the motion to suppress, urged for the first time on appeal, contrary to La. C. Cr. P. art. 841. It should not even be considered.
 

 Even if reviewed on the merits, however, this assignment of error is not supported by the record. Sinclair relies on the testimony of Officer White and Deputy Price, mischaracterizing their testimony as evidence that Sinclair “made it clear he did not want to talk to them” and that his actions in this regard were constitutionally sufficient to invoke his right to remain silent.
 

 White testified at the suppression hearing that he had just started his shift while booking Sinclair, and was unaware of the details of the crime. While he noted that Sinclair did not “appear” to want to make a statement, he never attempted to interview him because he was not familiar with the case.
 

 Price interviewed Sinclair later that morning, again reading the rights to defendant, who signed, agreeing to questioning. Sinclair provided a written statement as to his whereabouts at the time of the
 
 *55
 
 crime, denying any involvement. Never did Price testify that Sinclair had “refused to speak about the ease.”
 

 To the extent a defendant’s negative reply to a question about whether he had anything to say about a crime “could not plausibly be understood as an invocation, ambiguous or otherwise, to cut off police questioning in all respects,” as per
 
 State v. Robertson,
 
 97-177 (La.3/4/98), 712 So.2d 8,
 
 cert. denied,
 
 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 |14(1998), then
 
 a fortiori,
 
 an officer’s subjective belief that a defendant is reluctant to talk about his conduct would also not constitute an invocation of the right to remain silent. Sinclair never said he did not want to speak to the police. When interrogated on three separate occasions, he spoke voluntarily after being advised of his right to remain silent. Accordingly, we reject Sinclair’s argument that he had unequivocally invoked his right to remain silent.
 

 Sinclair also argues regardless of whether the right was invoked, Chief Rogers’ failure to ascertain whether the right had been invoked before questioning him on the morning of July 23, 2001, was a constitutional violation sufficient to warrant suppression of the confession. This argument is rooted in the requirements in
 
 Miranda, supra,
 
 that statements stemming from custodial interrogation cannot be used unless the prosecution “demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination.” Sinclair argues that an officer must ascertain from sources other than the suspect whether the right against self-incrimination had been invoked.
 
 Miranda,
 
 however, provides for a reasonable application of this requirement.
 
 [7]
 

 11SA defendant’s invocation of his right to silence must be unambiguous.
 
 Berghuis v. Thompkins,
 
 — U.S. -, 130 S.Ct. 2250, 176 L.Ed.2d 1098 (2010).
 

 Here, Chief Rogers indicated that these safeguards were complied with when he recited Sinclair’s rights to him, and Sinclair waived them. While Sinclair did not confirm this fact due to a failure to “recall,” he did not deny it. Furthermore, Sinclair admitted that on three other occasions he had been informed of his rights and signed statements agreeing to questioning. Sinclair has cited no authority that the failure by a police officer to verify someone else’s recollection that the defendant did not invoke his right against self-incrimination is fatal to the state’s use of a confession. This record does not support a conclusory allegation that Rogers made no efforts to determine whether Sinclair had invoked his right to remain silent. Neither Rogers nor Wright was ever asked whether they had inquired or had any reason to know whether Sinclair had
 
 *56
 
 invoked his right to remain silent. While both denied having inquired whether Sinclair had been appointed counsel, which he had not, they both never stated they had any reason to know whether he had invoked his right against self-incrimination. This assignment is meritless.
 

 DECREE
 

 The defendant’s conviction and sentence are AFFIRMED.
 

 [1]
 

 .
 
 Miranda v. Arizona,
 
 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
 

 [2]
 

 . Not surprisingly, Sinclair disagrees with the state’s version of what transpired on the morning of July 23, 2001, when he was interviewed by Rogers and Wright, claiming that Rogers told him that the victim had died and that he would be charged with murder. Sinclair claimed that, conditioned upon his confessing, Rogers offered to lobby for a light sentence on his behalf. Based on these representations, Sinclair asserts that he confessed to a crime he did not commit in order to get a lighter sentence.
 

 [3]
 

 .The July 23, 2001, statement was subsequently admitted into evidence at trial without objection from Sinclair regarding the manner in which it was obtained.
 

 [4]
 

 . Specifically, Sinclair's May 30, 2007, letter attempting to terminate representation by his counsel and his June 11, 2007,
 
 pro se
 
 motion to quash.
 

 [5]
 

 . La. C. Cr. P. art. 578 provides:
 

 A. Except as otherwise provided in this Chapter, no trial shall be commenced nor any bail obligation be enforceable:
 

 (1) In capital cases after three years from the date of institution of the prosecution;
 

 (2) In other felony cases after two years from the date of institution of the prosecution; and
 

 (3) In misdemeanor cases after one year from the date of institution of the prosecution.
 

 B. The offense charged shall determine the applicable limitation.
 

 La. C. Cr. P. art. 580 provides:
 

 When a defendant files a motion to quash or other preliminary plea, the running of the periods of limitation established by Article 578 shall be suspended until the ruling of the court thereon; but in no case shall the state have less than one year after the ruling to commence the trial.
 

 For purposes of Article 580, a preliminary plea is any pleading or motion filed by the defense which has the effect of delaying trial.
 
 State v. Cranmer,
 
 306 So.2d 698 (La.1975);
 
 State v. Elfert,
 
 247 La. 1047, 175 So.2d 826 (1965). These pleadings include properly filed motions to quash, motions to suppress, or motions for a continuance, as well as applications for discovery and bills of particulars.
 
 State v. Brooks,
 
 505 So.2d 714 (La.1987), ce
 
 rt. denied,
 
 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987). Joint motions for a continuance fall under the same rule. See
 
 State v. Rome,
 
 93-1221 (La.1/14/94), 630 So.2d 1284.
 

 In
 
 Elfert, supra,
 
 the Louisiana Supreme Court held that the delays occasioned by the defendants’ attempts to secure counsel justified continuing trial set only two weeks before prescription was due to expire, whether the defendants themselves moved for a continuance or the court upset the trial date
 
 ex pro-prio motu
 
 for purposes of effectuating the defendants’ Sixth Amendment right to counsel.
 

 In
 
 State v. Carr,
 
 271 So.2d 871 (La.1973), however, the court qualified its decision in
 
 Elfert
 
 by holding that a defendant’s efforts to secure counsel do not constitute grounds for suspension of the time limits for trial specified by La. C. Cr. P. art. 578 when they have not "affected the State's efforts to prosecute in any respect.”
 
 State v. Carr,
 
 at 872. While Carr does not reference
 
 Elfert,
 
 the main factual distinction appears to be that the
 
 Elfert
 
 trial was set for two weeks from the time defendant sought to secure new counsel, while the
 
 Carr
 
 trial was scheduled more than six months out.
 

 In
 
 State v. Brooks,
 
 02-0792 (La.2/14/03), 838 So.2d 778, 783-4, the Louisiana Supreme Court elaborated on the proper considerations to be made in determining whether a defendant’s efforts to secure counsel affect the State’s efforts to prosecute:
 

 Although a formal motion may not have been filed on that date, and it is not clear from the record when [present counsel] formally enrolled as counsel for respondent, it is clear that the trial court continued the status conference and arraignment set for that day for purposes of providing respondent with the opportunity to substitute counsel for the missing [prior counsel]. The continuance on that date, solely for purposes of effectuating respondent’s Sixth Amendment right to counsel and to accommodate the confusion in the defense caused by [prior counsel’s] baffling disappearance, suspended the running of the time limits because the state’s ability to prosecute the case was actually affected until the matter of representation was settled and respondent again had counsel. Louisiana imposes on a prosecutor the ethical duty to "[m]ake reasonable efforts to assure that the accused has been advised of the right to, and the procedure for obtaining, counsel,
 
 and has been given reasonable opportunity to obtain counsel
 
 ...La. State Bar Ass’n Rules of Professional Conduct, Rule 3.8(b) (emphasis added); see also Model Rules of Prof’l Conduct R. 3.8(b). As a matter of that ethical constraint, the state could not push this case forward until the question of
 
 *52
 
 respondent's representation by counsel was settled. [The prosecutor] could not have communicated or bargained directly with respondent regarding her open plea offer while he was ostensibly still represented by [prior counsel] although attempting to retain other counsel, La. Rules of Professional Conduct, Rule 4.2; ... nor, finally, could she have unilaterally set a trial date with any reasonable likelihood it would take place as scheduled to justify the issuing of subpoenas for the state’s witnesses and preparing them for trial....
 

 Under these circumstances, we conclude that the continuance of the status hearing on June 20, 2000, on respondent's behalf, for purposes of allowing him to substitute other retained counsel for the inexplicably missing [prior counsel], constituted a preliminary plea within the scope of La. C. Cr. P. art. 580 and gave the state at least until June 20, 2001, to bring the case to trial. The trial court therefore properly denied respondent's motion to quash the prosecution.
 

 [6]
 

 . La. R.S. 15:451 provides that before a purported confession can be introduced in evidence, it must be affirmatively shown to be free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. C. Cr. P. art. 703(D) provides that on the trial of a motion to suppress, the burden is on the defendant to prove the grounds of his motion, except that the state shall have the burden of proving the admissibility of a purported confession or statement by the defendant. A defendant bears the burden of asserting the basis for his motion to suppress in order to give the state adequate notice so that it may present evidence and address the issue. La. C. Cr. P. art. 703(E);
 
 State v. Jackson,
 
 04-1388 (La.App. 5th Cir.5/31/05), 904 So.2d 907,
 
 writ denied,
 
 05-1740 (La.2/10/06), 924 So.2d 162.
 

 
 *54
 
 When a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion,
 
 i.e.,
 
 unless such ruling is not supported by the evidence. See
 
 State v. Green,
 
 94-0887 (La.5/22/95), 655 So.2d 272. A trial court’s legal findings are subject to a
 
 de novo
 
 standard of review. See
 
 State v. Hunt,
 
 2009-1589 (La. 12/1/09), 25 So.3d 746.
 

 Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress.
 
 State v. Brown,
 
 434 So.2d 399 (La.1983). See also
 
 State v. Johnson,
 
 07-1040 (La.App. 4th Cir.9/10/08), 993 So.2d 326,
 
 writ denied,
 
 08-2649 (La.6/5/09), 9 So.3d 868;
 
 State v. Jackson, supra.
 
 Moreover, articulating a new basis for the motion to suppress for the first time on appeal is prohibited under La. C. Cr. P. art. 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. See
 
 State v. Cressy,
 
 440 So.2d 141 (La.1983).
 

 In
 
 State v. Robertson,
 
 97-177 (La.3/4/98), 712 So.2d 8,
 
 cert. denied,
 
 525 U.S. 882, 119 S.Ct. 190, 142 L.Ed.2d 155 (1998), the defendant claimed the trial court erred in admitting his confession because it was the result of police coercion after he had invoked his right to remain silent. The defendant argued that he invoked his Fifth Amendment right to remain silent when he responded “uh uh” to questioning about whether he wanted to say anything more about his involvement. The Louisiana Supreme Court found that the defendant’s indication he had nothing further to say about the crimes did not reasonably suggest a desire to end all questioning or to remain silent. Rather, the defendant’s negative reply, "uh uh,” could not plausibly be understood as an invocation, ambiguous or otherwise, to cut off police questioning in all respects. Instead, the defendant’s willingness to talk to authorities even after the "uh, uh” response was indicated by his continuing to respond to questions and to assert his innocence. The court noted that the defendant never indicated he did not want to speak to the police at all, only that he had nothing to say about the murders. The fact that the defendant continued to speak to police reflected an intent to continue the exchange.
 
 Robertson,
 
 at 31.
 

 [7]
 

 . "As for the procedural safeguards to be employed, unless other fully effective means are devised to inform accused persons of their right of silence and to assure a continuous opportunity to exercise it, the following measures are required. Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him. The mere fact that he may have answered some questions or volunteered some statements on his own does not deprive him of the right to refrain from answering any further inquiries until he has consulted with an attorney and thereafter consents to be questioned.”
 
 Miranda,
 
 384 U.S. at 444-5, 86 S.Ct. at 1612.