**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**


**26-141**


**STATE OF LOUISIANA**

**VERSUS**

**JAMES ALAN MUELLER**


**\*\*\*\*\*\*\*\*\*\***


**ON APPLICATION FOR SUPERVISORY WRITS FROM THE**
**FOURTEENTH JUDICIAL DISTRICT COURT**
**PARISH OF CALCASIEU, NO. 4957-24**
**HONORABLE DAVID A. RITCHIE, DISTRICT JUDGE**


**\*\*\*\*\*\*\*\*\*\***


**VAN H. KYZAR**
**JUDGE**


**\*\*\*\*\*\*\*\*\*\***


Court composed of Van H. Kyzar, Guy E. Bradberry, and Clayton Davis, Judges.


**WRIT GRANTED; RELIEF DENIED;**
**AND REMANDED.**

**Andrew T. Leonards**
**Adam P. Johnson**
**The Johnson Firm**
**P. O. Box 849**
**Lake Charles, LA 70602**
**(337) 433-1414**
**COUNSEL FOR DEFENDANT/RELATOR:**
**James Alan Mueller**

**Stephen C. Dwight**
**District Attorney**
**John Eric Turner**
**Assistant District Attorney**
**Fourteenth Judicial District**
**901 Lakeshore Drive, Suite 800**
**Lake Charles, LA 70601**
**(337) 261-0225**
**COUNSEL FOR RESPONDENT:**
**State of Louisiana**

**KYZAR, Judge.**

Defendant-Relator, James Alan Mueller, seeks supervisory review of the trial court's denial of a motion to suppress his confession. Finding no error in the trial court's ruling, we grant the writ but deny relief and remand the matter for further proceedings.

### FACTS AND PROCEDURAL HISTORY

Defendant is charged by grand jury indictment with the second degree murder of his son-in-law, Raymond Charles Lastrapes, in violation of La.R.S. 14:30.1. On April 7, 2025, Defendant filed a Motion to Suppress seeking to suppress the "incriminating statements" he made to law enforcement. Defendant contends that the statements were obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), because he invoked his right to remain silent at the scene, the arresting officer ceased questioning him and informed the other officers that he did not want to talk, and he was later brought to the police department and interviewed by other detectives, which resulted in his inculpatory statements. A hearing on the motion to suppress was held on October 16, 2025.

During the hearing, Corporal Noah Veronie, of the Calcasieu Parish Sheriff's Office (CPSO), testified that he was dispatched to a trailer park on West McNeese Street at around noon on December 3, 2023, in relation to a shooting. At the time, he was still under the supervision of a Field Training Officer (FTO), Corporal Keithen Breaux, as he was relatively new to the department. On arriving at the location, he joined the other officers in approaching the victim, who was lying on the ground.

After the officers ascertained that Defendant was the suspect, he was coaxed out of his trailer and, ultimately, was arrested by Corporal Veronie. Corporal

Veronie testified that he handcuffed Defendant, walked him to Corporal Breaux's police unit, and read him his *Miranda* rights. According to Corporal Veronie, he read the rights from a card and concluded by asking Defendant if he agreed to waive his rights and speak with law enforcement, to which Defendant replied, "I have nothing to answer about for." At that point, Corporal Veronie left Defendant in the backseat of the police unit. Corporal Veronie explained that to him, the statement reflected that Defendant felt justified in his actions and not that he was invoking his right to remain silent.

Corporal Veronie testified that he relayed Defendant's statement to his FTO and his lieutenant, noting that he thought the statement was odd and that Defendant's "state of mind was a little off." He clarified that he relayed the comment to his supervisors because it was odd and not as a warning that Defendant had invoked his right to remain silent. Corporal Veronie stated that he spoke with Defendant multiple times at the scene, noting that Defendant expressed concern about his trailer not being locked when they left. Describing Defendant as "talkative[,]" Corporal Veronie stated that they transported him to the headquarters of the Lake Charles Police Department (LCPD) to be interviewed, although they had to wait some time for the detectives' arrival. Corporal Veronie testified that during that time, he casually spoke with Defendant at length about military service and Hurricane Laura but denied that he questioned Defendant about the case or that he pressured Defendant to speak with the detectives.

Corporal Veronie identified State's Exhibit S-A, a copy of his body camera footage from the scene of the shooting, and State's Exhibit S-C, a copy of the video from the dash camera of his FTO's police unit. While viewing and discussing Exhibit

2

S-C, he testified that Defendant had made spontaneous statements while he was alone in the police unit, including the statement, "I just killed me a [sic] N word."

The video in Exhibit S-A began, according to the timestamp, at 12:23 p.m. on December 3, 2023, with Corporal Veronie executing a traffic stop. After the traffic stop was concluded, Corporal Veronie received a call regarding a shooting and quickly proceeded at 12:39 p.m. to the trailer park where the shooting occurred. He immediately exited his police unit and joined a small group of officers, who were staging behind an officer's SUV, before approaching the victim. As Corporal Veronie and his FTO approached the trailer where Defendant was located, a relative of Defendant's informed them that the front door was the trailer's only operational door, that Defendant was inside with a child, and that he was armed with a loaded lever-action 30-30 rifle.

In response to the officers' commands, Defendant exited the front door and complied with their command to put his hands up. He then walked backward with his hands raised until he was ordered to kneel, at which point he knelt down with his hands still in the air. After a pat down by Corporal Veronie, Defendant stated that his gun was located in his trailer, next to the refrigerator. Corporal Veronie then informed Defendant of his right to an attorney before or during questioning as well as his right to remain silent. He ended his recitation of the *Miranda* warnings by asking if Defendant was willing to answer questions. Defendant shook his head "no." Corporal Veronie responded by telling Defendant, "I need an audible answer," to which Defendant replied, "I don't have nothing to answer about for." After walking Defendant to his FTO's police unit, Corporal Veronie adjusted Defendant's handcuffs. Defendant can be heard asking a female officer to lock up his trailer before leaving and telling her that a key to the trailer was located on the refrigerator.

When asked by another officer if Defendant had disclosed anything, Corporal Veronie paraphrased Defendant's answer as "he has nothing to answer for." The other officer replied, "Well, okay[,]" and walked away.

Defendant asked Corporal Veronie to make sure that his eldest grandson was given his cell phone. When his FTO approached, Corporal Veronie told him that Defendant had "been Mirandized, he's been run, he said he doesn't want to say anything." He then clarified that Defendant said he "had nothing to answer for." At that time, an order came over the radio instructing the officers that "[i]f you haven't already, turn your cameras off." After clarifying that the order was to turn off the cameras, Corporal Veronie turned off his body camera.

A second video clip from Corporal Veronie's body camera was also played at the hearing. The video, which was recorded at LCPD headquarters, has an initial timestamp reading of 3:17 p.m. In the clip, Corporal Veronie told his FTO that he brought Defendant outside as he was experiencing back pain from the chair in the interview room. While outside, Defendant spoke conversationally with Corporals Veronie and Breaux about their favorite place to have their personal vehicles inspected and about Hurricane Laura. Ultimately, Defendant suggested that they go back inside because he did not want the officers to get in trouble for bringing him outside. Upon returning to the interview room, Defendant asked about the type of handcuffs the officers used. Corporal Veronie then deactivated his body camera at 3:25 p.m.

On cross-examination, Corporal Veronie testified that he was still under the supervision of his FTO at the time of the shooting, noting that he had graduated from the CPSO Post-Academy in November, about one month before the shooting. He acknowledged that after a neighbor called Defendant on his phone, one of the

4

officers told him that he needed to exit his trailer, and he complied. Corporeal Veronie acknowledged that he read Defendant his rights after he asked him where his gun was located, that Defendant did not waive his rights, and that he then placed Defendant into the back of his FTO's police unit. Corporal Veronie repeatedly denied that he interpreted Defendant's response to the question of whether he waived his rights as a refusal to waive them. Instead, he said he stopped questioning Defendant because he knew that the detectives, who would be questioning him, were better trained and more experienced in asking questions. Nonetheless, he acknowledged that he ceased questioning Defendant. Corporal Veronie estimated that Defendant was alone in the vehicle for roughly twenty minutes before he was transported to LCPD headquarters. When questioned about being instructed to turn off his body camera at the scene of the shooting, Corporal Veronie stated that he did not recall such an instruction.

Corporal Veronie testified that Defendant was initially placed in LCPD's interview room, and he acknowledged that Defendant was in the room for about three hours before he was handed over to the detectives. He stated that he did not speak with Detective William Loving, one of the investigators, before the latter interviewed Defendant, and he again acknowledged that his body camera was turned off for the majority of the three hours before Defendant's interview.

Detective Loving, a twenty-two-year LCPD veteran, testified that he assisted the lead investigator, Detective McCloskey, in the shooting investigation. He noted that he was unaware of Defendant's prior comment to Corporal Veronie or that Corporal Veronie had read Defendant his *Miranda* rights prior to the interview. He stated that Defendant never mentioned that he had previously been advised of his rights or that he wished to invoke his right to remain silent or to have a lawyer present

5

during questioning. Detective Loving identified State's Exhibit S-B, a USB drive containing the video and transcript of Defendant's interview. He described his interview with Defendant as conversational and relaxed.

The video of the interview begins with Detective Loving filling out a waiver-of-rights form with Defendant, and when asked if he wished to waive his rights and to speak with the detectives, Defendant asked, "What are we gonna [sic] talk about?" When informed that they would be talking about the incident at his trailer, Defendant stated, "Yeah, we can talk[,]" and signed the waiver-of-rights form. During the interview, Defendant claimed that the victim was in his face yelling at him when one of his grandsons, who was scared of the victim, went into Defendant's room and got his rifle. Defendant stated that he took the rifle from his grandson after the victim yelled at the grandson because he had the rifle. Defendant then stated that "[t]hings escalated. And that's all I'm gonna say about it." When asked, "Who loaded it[,]" Defendant replied that it was loaded by his grandson. One of the detectives stated, "So you said you don't want to talk about it[,]" and the other detective said that they were trying to figure out how the shouting match turned into a shooting. Defendant then confirmed that he took the gun from his grandson and that the victim was trash-talking him.

On cross-examination, Detective Loving agreed that had Defendant refused to waive his rights at the time of his arrest, he would have been taken straight to booking instead of being interviewed. He was also certain that he was not informed prior to the interview that Defendant had previously been Mirandized and had refused to waive his rights. Detective Loving also testified that he was not at the scene of the shooting when the officers were instructed to deactivate their body

6

cameras; however, he noted that it was customary to give the order "[a]fter the scene is secure and [the officers] are no longer interacting with the public[.]"

Detective Loving acknowledged that neither Corporal Veronie's nor Corporal Breaux's body cameras were on during the majority of the three hours they were at headquarters before handing Defendant over to him and Detective McCloskey. After a discussion regarding the importance of body-camera footage, Detective Loving admitted that there was only about thirty minutes worth of body-camera footage from the scene of the shooting because the officers were instructed to turn off their body cameras. He further admitted that he only learned about this after the fact. Detective Loving stated that although he arrived back at LCPD headquarters at around 2:30 p.m., Defendant was not interviewed until roughly three hours later because he interviewed Defendant's neighbor before speaking with him.

The initial hearing on the motion to suppress was recessed after the State rested and Defendant indicated that he planned to call Corporal Breaux to testify. When the hearing resumed on February 10, 2026, and Defendant did not call any witnesses, the parties proceeded to argument. The State's argument largely focused on whether Defendant's statement that "I don't have nothing to answer about for[,]" was an invocation of his right to remain silent. Defense counsel argued that based on the video evidence at the scene, Defendant's response to Corporal Veronie was an invocation of his right to remain silent, which was why Corporal Veronie told his supervising officers that Defendant did not want to talk. Defense counsel also focused heavily on the fact that the officers' body cameras were turned off at the scene less than thirty minutes into the investigation, and the fact that less than two minutes of the three-plus hours Defendant waited at LCPD headquarters was

7

recorded. At the conclusion of argument, the trial court took the motion under advisement.

During its February 11, 2026 ruling, the trial court ultimately denied Defendant's motion, finding that his statement to the detectives was free and voluntary and, therefore, admissible. Relying on *State v. Gaspard*, 96-1279 (La.App. 3 Cir. 2/11/98), 709 So.2d 213, *writ denied*, 98-582 (La. 7/2/98), 742 So.2d 202, the trial court found no prohibition against the detectives' later questioning of Defendant, when he was again advised of his *Miranda* rights. It further found that Defendant waived his right to remain silent, finding no evidence that he was pressured or coerced into waiving his rights. As a result, Defendant filed this application for supervisory review.

Herein, Defendant asserts three assignments of error:

1. The district court erred in denying the motion to suppress because Mueller declined to waive and thereby invoked his Miranda right to remain silent when he responded to Officer Veronie's waiver question, after which questioning immediately ceased.

2. The district court erred in denying the motion to suppress because, even if Mueller's response is characterized as an invocation of the right to remain silent rather than merely a refusal to waive, the State failed to prove that Mueller's right to cut off questioning was "scrupulously honored" before law enforcement initiated later custodial interrogation.

3. The district court erred in relying on *State v. Gaspard*, 96-1279 (La.App. 3 Cir. 2/11/98), 709 So.2d 213, because the facts of that case are materially distinguishable from the circumstances presented here.

**DISCUSSION**

Although Defendant sets forth three separate assignments of error, we find that they present the same singular claim, that the trial court erred in denying the motion to suppress his statement. As such, we will address the claims together.

8

In summary, Defendant's argues he invoked his right to remain silent, when asked by Corporal Veronie if he wished to waive his rights, by shaking his head "no" and stating that he "had nothing to answer about for." He argues that the detectives did not honor that invocation, and the subsequent waiver-of-rights form signed by him during the interview should not be considered a free and voluntary waiver of his rights. We find no merit in Defendant's argument.

As a trial court is afforded great discretion when ruling on a motion to suppress, its ruling "will not be disturbed absent an abuse of that discretion." *State v. Leger*, 05-11, p. 10 (La. 7/10/06), 936 So.2d 108, 122, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007).

> In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court
>
>> promulgated a set of safeguards to protect the there-delineated constitutional rights of persons subject to custodial police interrogation. In sum, the Court held in that case that unless law enforcement officers give certain specified warnings before questioning a person in custody, and follow certain specified procedures during the course of any subsequent interrogation, any statement made by the person in custody cannot over his objection be admitted in evidence against him as a defendant at trial, even though the statement may in fact be wholly voluntary.
>
> *Michigan v. Mosley*, 423 U.S. 96, 99–100, 96 S.Ct. 321, 324–325, 46 L.Ed.2d 313 (1975). In addition to showing that the *Miranda* requirements were met, the state must "affirmatively [show] that [the statement or confession] was free and voluntary, and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises" in order to introduce into evidence a defendant's statement or confession. La. R.S. 15:451.
>
> The *Miranda* holding "protects an individual's Fifth Amendment privilege during incommunicado interrogation in a police-controlled atmosphere." *State v. Taylor*, 2001-1638 p. 6 (La.1/14/03), 838 So.2d 729, 739, *cert. denied*, 540 U.S. 1103, 124 S.Ct. 1036, 157 L.Ed.2d 886 (2004). This court has held that "*Miranda* does not require that a defendant exercise his right to remain silent by any particular phrasing.

In fact, the Supreme Court in *Miranda* stated, if the individual 'indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.' " *Taylor*, 2001-1638 p. 6, 838 So.2d at 739.

"When a defendant exercises his privilege against self-incrimination the validity of any subsequent waiver depends upon whether police have 'scrupulously honored' his right to remain silent." *Taylor*, 2001-1638 p. 6, 838 So.2d at 739, citing *Mosley*, 423 U.S. at 104, 96 S.Ct. at 326. The Court identified the critical safeguard in the right to remain silent as a person's "right to cut off questioning." *Mosley*, 423 U.S. at 103, 96 S.Ct. at 326. "Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation." *Mosley*, 423 U.S. at 103–104, 96 S.Ct. at 326.

Whether the police have "scrupulously honored" a defendant's "right to cut off questioning" is a determination made on a case-by-case basis under the totality of the circumstances. *Mosley*, 423 U.S. at 104–106, 96 S.Ct. at 326–328; *Taylor*, 2001-1638 p. 7, 838 So.2d at 739; *State v. Brooks*, 505 So.2d 714, 722 (La.1987), *cert. denied*, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).

Factors going into the assessment include who initiates further questioning, although, significantly, police are not barred from reinitiating contact, . . . whether there has been a substantial time delay between the original request and subsequent interrogation; whether *Miranda* warnings are given before subsequent questioning; whether signed *Miranda* waivers are obtained; and, whether the later interrogation is directed at a crime that had not been the subject of the earlier questioning. *Michigan v. Mosley*, 423 U.S. at 105, 96 S.Ct. 321, 46 L.Ed.2d 313; *Brooks*, 505 So.2d at 722; *[State v.] Harper*, 430 So.2d [627,] at 633.

*Taylor*, 2001-1638 p. 7, 838 So.2d at 739; *see* Mosley, 423 U.S. at 103–104, 96 S.Ct. at 326.

*Id.* at 124–25 (alterations in original) (footnote omitted).

"A defendant's invocation of his right to silence must be unambiguous." *State v. Sinclair*, 45,625, p. 15 (La.App. 2 Cir. 11/3/10), 55 So.3d 47 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 130 S.Ct. 2250 (2010)), *writ denied*, 10-2718 (La. 4/29/11), 62 So.3d 110.

> Whether the police have scrupulously honored a defendant's right to cut off questioning is a determination made on a case-by-case basis under the totality of the circumstances. *State v. Leger*, 05-0011, p. 14 (La.7/10/06), 936 So.2d 108, 125 (*citing Michigan v. Mosely*, 423 U.S. 96, 104–106, 96 S.Ct. 321, 326–328, 46 L.Ed.2d 313 (1975)), *cert. denied*, [549] U.S. [1221], 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). Under the totality of the circumstances as shown on the videotape of the interrogation, defendant's statements did not reasonably suggest a desire to end all questioning or remain silent.

*State v. Prosper*, 08-839, p. 1 (La. 5/14/08), 982 So.2d 764, 765.

Here, the trial court found that Defendant failed to unequivocally invoke his right to remain silent when questioned by Corporal Veronie, and notwithstanding that finding, the detectives were not precluded from later questioning Defendant after reading him his *Miranda* warnings and after he waived his right to remain silent. In so finding, the trial court relied on this court's holding in *Gaspard*, 709 So.2d at 218–19 (last alteration in original), which held:

> The Louisiana Supreme Court noted in [*State v.*] *Green*, [94-887, p. 10 (La. 5/22/95),] 655 So.2d [272,] 280, n. 8, that there is a difference between invoking one's *Miranda* rights and simply declining to waive these rights.
>
> > The position of an arrestee who has expressly *invoked* his *Miranda* rights, either to remain silent or to the assistance of counsel, is distinguishable from one who has been informed of his rights but has chosen for whatever reason not to avail himself of them. *See Davis v. United States*, 512 U.S. 452, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994). When a person in police custody invokes his *Miranda* rights, the conditions under which the police may legitimately continue interrogating that person, as well as the circumstances under which a valid waiver may be obtained, are rigidly circumscribed. *See McNeil v. Wisconsin*, 501 U.S. 171, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *Minnick v. Mississippi*, 498 U.S. 146, 111 S.Ct. 486, 112 L.Ed.2d 489 (1990); *Michigan v. Mosley*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). When *Miranda* protections are not specifically invoked, on the other hand, police may continue questioning the suspect in the hope of obtaining a statement since "[t]he fundamental purpose of the Court's decision in *Miranda* was 'to assure that *the individual's right to choose* between speech and

11

silence remains unfettered throughout the interrogation process." *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S.Ct. 828, 831, 93 L.Ed.2d 920 (1987) (*citations omitted*) (*emphasis in original*). Nevertheless, in either case the admissibility of any statement obtained through custodial interrogation ultimately depends upon whether the defendant, either expressly or impliedly, waived his rights prior to speaking. *State v. Abadie*, 612 So.2d 1 (La.1993), *cert. denied*, 510 U.S. 816, 114 S.Ct. 66, 126 L.Ed.2d 35 (1993).

The action of Defendant in shaking his head, as if to indicate that he did not wish to talk to Corporal Veronie, while also stating, "I have nothing to answer about for[,]" is not an unambiguous invocation of the right to remain silent. Indeed, Corporal Veronie testified that although he stopped questioning Defendant, he did not perceive Defendant's statement as invoking his right to remain silent but as a statement reflecting Defendant's belief that he was justified in his actions. He indicated, rather, that he wanted to leave Defendant's questioning to the more experienced investigators as he had just finished his initial POST training and was relatively new to the department.

In *State v. Robertson*, 97-177, pp. 23, 27 (La. 3/4/98), 712 So.2d 8, 28, 31, *cert. denied*, 525 U.S. 882, 119 S.Ct. 190 (1998), our supreme court held that the defendant's response, "uh, uh[,]" to an officer's statement, "so you don't want to say no more about what happened over there at them old people's house[,]" did "not reasonably suggest a desire to end all questioning or" amount to an invocation of his right to remain silent. In *Prosper*, 982 So.2d at 765, the supreme court held that the defendant's response, "'I don't have nothing else to say sir 'cause [sic] I'm telling the truth[,] I'm telling the truth[,] I don't have nothing else to say[,]'" to the detective's statement, "'I don't want to listen to a lie, man[,]'" was not an invocation of his right to remain silent. In our view, the statement, "I have nothing to answer

about for[,]" is even more ambiguous and more equivocal than the statements at issue in *Robertson* and *Prosper*. Accordingly, the trial court did not abuse its discretion in concluding that Defendant failed to invoke his right to remain silent.

Moreover, Defendant later waived his right to remain silent after being advised of his *Miranda* rights by Detective Loving. Nothing prohibited Detective Loving from attempting to question Defendant as Defendant had not specifically invoked his *Miranda* protections when questioned by Corporal Veronie, and he waived his right to remain silent during the interview by Detective Loving. *See Gaspard*, 709 So.2d 213. The trial court, after reviewing the totality of the circumstances, noted that although the officers' body cameras were turned off hours earlier because Defendant was no longer being questioned at the scene, it found no evidence, or even argument, that Defendant was coerced into waiving his right to remain silent. The trial court further considered the significant length of time between Defendant's interaction with Corporal Veronie and his questioning by Detective Loving and specifically found that no coercion or pressure was placed on Defendant to force his confession:

> There's no indication that there was any pressure associated with, any pressure asserted on him with regard to the statement.
>
> So I don't think that the absence of body cam, so I don't think that, I don't think the absence of body cams during that time when there's no other evidence anywhere of any pressure placed on the defendant.
>
> The defendant doesn't assert that there's any pressure placed on him. There's no evidence on the video that there's any pressure. The absence of body cam, I'm being asked to, I guess, to assume that because there's no body cam, that there must have been, or that that creates, I guess, doubt as to whether there was pressure on him; and I don't think that's - - I just don't think that's - - I just don't think I get there from here.

I haven't seen anything that would cause me to doubt that or to have, or to believe that there was any kind of pressure placed on him.

The trial court properly evaluated the admissibility of Defendant's statement and the voluntariness of his waiver and, based upon the totality of the circumstances, determined that the statement was admissible. We find no error in that decision.

## DECREE

For the foregoing reasons, we grant Defendant's writ application but deny the relief requested. The judgment of the trial court, denying the motion to suppress and finding the evidence admissible, is affirmed. The matter is remanded to the trial court for further proceedings consistent herewith.

**WRIT GRANTED; RELIEF DENIED; AND REMANDED.**