TERRI F. LOVE, Judge.
 

 I,Defendant Jackie Green was indicted on two counts of second-degree murder and entered pleas of not guilty. Defendant filed motions to suppress the evidence, confession, and identification. Defendant was found guilty as charged on both counts of second-degree murder, and he was sentenced on both counts to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
 

 Defendant appeals, arguing that the verdicts of second-degree murder are “irrational” because the mitigating factors of “sudden passion” or “heat of blood” introduced at trial only support verdicts of manslaughter. Defendant also argues that the trial court erred in admitting into evidence the recording of a conversation with his mother.
 

 We find that the evidence presented was sufficient to prove that Defendant had the specific intent to kill or to inflict great bodily harm before entering the house. Further, we find that the trial court did not err in admitting into evidence the recording of Defendant’s conversation with his mother, as the interrogation room became Defendant’s temporary jail in which he had no reasonable expectation of privacy. Defendant’s convictions and sentences are affirmed.
 

 |,STATEMENT OF THE CASE
 

 Defendant was indicted on two counts of second-degree murder. Defendant entered pleas of not guilty. Counsel for Defendant filed motions to suppress the evidence, confession and identification, and the district court denied all three motions. Counsel for Defendant filed a three-part motion
 
 in limine.
 

 The district court ruled to only allow the murder weapon and shells to be introduced as evidence, to allow the taped conversations between Defendant and his family to be introduced as evidence and, to disallow the first 911 tape into evidence. The State filed an emergency writ in this Court. This Court granted the writ, reversed the district court’s ruling on the 911 tape, and ruled the 911 tape admissible. Following a two day trial, Defendant was found guilty as charged on both counts; Defendant was sentenced on both counts to life imprisonment at hard labor without benefit of parole, probation or suspension of sentence.
 

 
 *232
 
 FACTS AND PROCEDURAL BACKGROUND
 

 The following facts were adduced at trial and at the motion to suppress hearing:
 

 Cierra Williams, daughter of the victim, Marilyn Williams Green, testified that her mother and Defendant were married in 2001. Cierra was five years old when they met and began to date each other. Cierra had a very close relationship with Defendant. She never observed Defendant show physical violence towards her mother but admitted that they had violent “words” with each other. Prior to Hurricane Katrina, Defendant and the victim were separated for approximately one year. Cierra had no contact with Defendant during that time. After the storm, Cierra, her mother, and two cousins moved into a FEMA trailer with Defendant. |sThe arguments continued with cursing and yelling by Defendant. Cierra testified that Defendant never harassed her or her mother after he moved out of the Cavalier Drive house. However, on one occasion Defendant used his house key to enter the house. When Defendant discovered that one of Cierra’s cousins was in the middle bedroom, he quickly left the house. Cierra stated that her mother asked Defendant for his house key when he left, but he must have had a copy of the key. Her mother did not change the locks because she could not afford to do so, nor did she obtain a restraining order. On one occasion she found her mother upset and crying because Defendant had made verbal threats to her. She referred to an incident of a verbal threat made by Defendant to her mother during a cell phone call on April 10, 2009. Her mother recorded the threat and went to a police station to press charges. She stated that she never would have expected Defendant to kill her mother.
 

 Cierra described an April 10, 2009 incident as a vehicle confrontation by Defendant. As she and her mother were driving home, Defendant drove behind their vehicle and began to bump the back of the vehicle. At the same time, he called Cier-ra’s cell phone and ordered her mother to answer the phone. Cierra testified as follows:
 

 “And my mom was like, speed up, speed up, speed up. So I answered the phone. He was like, tell your mama to get the phone. My mom, she was making hand gestures, I don’t want the phone. I was like, she said she don’t want the phone. He was telling that “B” to get the phone. My mom still did her hand, she don’t want to. I said, she don’t want to talk. During the time I placed the phone on speaker, and he said, tell that “B” I’m going [sic] kill her and hung up the phone. At the same time he’S [sic] still running as if he was going to hit the vehicle.”
 

 She and her mother drove to the police station and explained what had occurred, and she further testified as follows:
 

 14“And at this time he was still calling my phone. Yeah. He called it again. It was private, of course. And I placed the phone on speaker. And I said, why you just said you was going to kill my mama? And one of the police was like sitting, waiting for him to say something. I say, why you say you was going to kill my mama? He said, I’m not going to kill your mama. And the police was kind of laughing. Where y’all at? Y’all at the police station? Y’all at the police station? He hurry up and hung the phone up.”
 

 The date was April 10, 2009; her mother was murdered on April 25, 2009. Cierra testified that when she returned home at approximately 12:30 p.m. on the date of the incident she observed yellow tape, a
 
 *233
 
 barricade, an ambulance, police cars, and a lot of her neighbors standing outside her mother’s residence on Cavalier Drive. She learned that her mother and her mother’s Mend, Lionel Nelson, had been shot to death. She testified that her mother and Defendant were divorced in 2006. Later, they reconciled and lived together from late 2006 until late 2007 in a FEMA trailer located on Defendant’s aunt’s property. They moved back into their home on Cavalier Drive in September 2007. In February 2009, Defendant and the victim separated again, and Defendant moved out of the house on Cavalier Drive. However, Cierra testified that Defendant returned to the neighborhood almost on a daily basis, driving past the Cavalier Drive house. He would speak to the neighbors and often would visit Cierra at the house. Eventually, Marilyn Green instructed Cierra not to allow Defendant into the house; Cierra obeyed her mother’s instructions and refused to allow Defendant into the house. Approximately twenty-three days after the murder, Cierra returned to the house and found her mother’s cell phone. She checked the incoming and outgoing calls and discovered that Defendant had made two calls to her mother on the night of the murders.
 

 IsSergeant Stuart Smith of the New Orleans Police Department testified that he responded to a call of a shooting of a female. Upon arriving at the scene, Sgt. Smith observed a black female lying in the grass between the sidewalk and the curb in front of the residence; the female was deceased. Sgt. Smith notified the dispatcher that the call was a possible homicide and to notify the homicide division, the crime lab, and the coroner’s office. The porch light of the residence was on and the front door was open. Smith notified the dispatcher that he was going to enter the residence to check for other victims or possible perpetrators. Smith approached the front door, announced his presence as a police officer, and asked if anyone was in the house. He heard a noise but could not tell if it was a person or an animal. He heard what he perceived to be a voice and a banging sound. He again announced his presence and gave the command to come out; there was no response. Sgt. Smith and two other police officers then proceeded inside the house and into a hallway. Sgt. Smith observed a black male lying on the floor of the master bedroom banging on the floorboard of the bed. A pool of blood was under the man’s left hip. The man kept saying, “I can’t breathe, I can’t breathe.” Sgt. Smith asked the man where he was shot. The man tapped his left hip and his chest. Sgt. Smith pulled up the man’s T-shirt and observed in the middle of his left upper chest a wound with both muscle and fat tissue exposed. The man was transported by Emergency Medical Services (EMS) to the hospital. Sgt. Smith observed blood spatter in the kitchen, master bedroom, bathroom, den and living room. In the den the coffee table was moved; items on the table were skewed; a house phone and strands of hair were on the floor. Sgt. Smith located shotgun wadding lying next to both victims. In the driveway of the residence, underneath the passenger side of a parked vehicle, Sgt. Smith found a spent twelve ftgauge shotgun shell. He ordered all the evidence to be collected by the crime lab and turned over to the homicide detectives.
 

 Dr. Paul McGary, forensic pathologist, performed the autopsy on Lionel Nelson. Dr. McGary reviewed the autopsy protocol written by Dr. Hubert who performed the autopsy on Marilyn Green. Lionel Nelson sustained two shotgun wounds; one entered the right lower chest, penetrated the abdomen, liver, and intestines, and exited through the left side of the stomach result
 
 *234
 
 ing in a lot of internal bleeding. The second shotgun wound was to the left upper thigh. Both wounds were inflicted at close range with a buckshot type load that stayed together in a small cluster. Death was due to blood loss and was classified as a homicide. Marilyn Green sustained two close range shotgun wounds. One went through the back of the forearm. The second entered through the left chest above the left breast, penetrated the right lower back, both lungs, the heart, aorta, lungs, liver and the major veins coming back to the heart. Death was due to massive internal hemorrhage.
 

 Dr. McGary described a shotgun shell as consisting of an outer casing containing gunpowder and an igniter surrounding either one lead ball, nine to twenty lead pellets, or hundreds of small birdshot lead pellets depending on the nature of the shell. Dr. McGary agreed that finding two shotgun wounds on each victim is not necessarily indicative of four shots fired. He opined that two shots could have inflicted the wounds on each individual.
 

 Emily Martinez, New Orleans Police Department crime lab technician, photographed, dusted the crime scene for fingerprints, collected evidence and completed a crime scene report. She identified photographs of the interior and exterior of 13649 Cavalier Drive and photographs of the female victim. Martinez |7colleeted seven spent pellets, two metal fragments, two shotgun shell wads, one twelve gauge double ought buck spent shotgun shell and partial latent fingerprints. All evidence was sent to the central property and evidence department.
 

 Martinez photographed all of the pellets and shotgun shells, but opined that it was possible that some may have been missed. She photographed the bed in the master bedroom but did not take a full picture of the mattress from top to bottom. She photographed the inside of the kitchen door but not the outside.
 

 Officer Troy Dickerson, forensic examiner with the New Orleans Police Department, processed Defendant’s vehicle, a two-door maroon Chevy Cavalier, following Defendant’s arrest. Inside the vehicle Dickerson found a Savage Arms twelve-gauge shotgun, model ninety-four, bearing serial number P, 440473; one unspent shell was inside the weapon. Dickerson photographed the interior and exterior of the vehicle and all evidence found inside the vehicle.
 

 Dickerson identified a photograph of the shotgun found inside Defendant’s vehicle showing the unspent shell inside the barrel.
 

 Detective Desmon Pratt of the New Orleans Police Department Homicide Division arrived at the scene, where his supervisor informed him that a black female was lying outside of the residence and a second victim had been transported to the hospital. He learned later that the second victim died in surgery. Det. Pratt spoke to the responding officers on the scene and instructed Emily Martinez to collect blood evidence, fingerprints, and to photograph the entire crime scene. Only Sgt. Smith was inside the house because he had rendered assistance to the male victim. The EMS responders entered through the front door; no one entered the side door to the house. Inside the master bathroom, Det. Pratt found shotgun wadding, and he observed blood evidence in the living room, hallway, | ^master bedroom, bathroom and two rooms off to the right of the master bedroom/bathroom. The female victim was found outside on the grass in front of the residence. Next to a parked vehicle in the driveway of the residence, Det. Pratt found shotgun wadding and a double ought buck shotgun shell.
 

 
 *235
 
 Following an interview with Cierra Williams, Det. Pratt developed Defendant as the prime suspect. He radioed a description of Defendant’s vehicle to the New Orleans Police Department, Jefferson Parish Sheriffs Office and the Louisiana State Police. The day following the murders, Det. Pratt received information that defendant obtained gas money to travel either to Mississippi or Baton Rouge to evade capture. Det. Pratt contacted the Slidell Police, the St. Tammany Parish Sheriffs Office, Kenner Police, LaPlace Police, the Baton Rouge Police, and the Troop “B” State Police to be on the look-out for a vehicle fitting the description of Defendant’s car. Subsequently, Det. Pratt was notified that Defendant had been arrested near the 1-10 twin spans near Oak Harbor as he drove east. Det. Pratt relocated to the location of Defendant’s arrest. Det. Pratt informed Defendant of his
 
 Miranda
 
 rights, placed him under arrest, and transported Defendant to New Orleans Police Department Headquarters. A red shirt, black shorts and Reebok tennis shoes were confiscated from Defendant; Defendant admitted that he wore the clothes when he shot the victims. Inside Defendant’s car, Det. Pratt observed a shotgun on the passenger seat. He secured the vehicle, and ordered the crime lab to process, photograph, and tow the vehicle to the crime lab.
 

 Det. Pratt testified that he arrived at the crime scene around 11:28 p.m. He performed a search of both crime scenes and ordered that they be secured. Inside the hall bathroom, Det. Pratt found seven double-ought buck pellets. Fragments of |3shotgun shell wadding were found in the master bedroom. Sergeant Smith informed Det. Pratt that the male victim told him that he had been shot twice. Det. Pratt received information from family members and others, who wanted to remain anonymous, that Defendant was planning on fleeing the area. Defendant’s grandfather told Det. Pratt that Defendant was planning on going to his girlfriend’s house in Baton Rouge. Defendant admitted that he had a girlfriend in Baton Rouge but did not state that he was planning on going there. Defendant was very cooperative when arrested. Forensic tests were positive for seminal fluid on Marilyn Green’s underwear.
 

 Detective Decynda Barnes, assigned to the New Orleans Police Department’s cold case files, advised Defendant of his
 
 Miranda
 
 rights and provided him with a waiver of rights form prior to taking his recorded audio/video statement. She read Defendant his
 
 Miranda
 
 rights. Defendant acknowledged he understood his rights, and he agreed to waive his rights and give a recorded audio/video statement to Detectives Barnes and Pratt. During the interview, Defendant requested to speak to his mother; his mother was contacted, and she agreed to come and speak to Defendant. Following the conclusion of the statement, Det. Barnes stepped out of the interview room. Defendant’s mother and sister entered the interview room. Within minutes she returned to ask Defendant about his clothes. The recording device was still operating. Defendant’s conversation with his mother was recorded (the recorded conversation was played for the jury).
 

 Detective Barnes did not participate in any other aspects of the homicide investigation. During the interview, Defendant told Det. Barnes that he “snapped” because he “had pressure on him from all different angles, ... stuff wasn’t going | mright” ... and “his marriage was bad and he caught somebody in the house sleeping with his old lady ...”
 

 Detective Orlando Mathews, homicide detective with the New Orleans Police De
 
 *236
 
 partment, assisted Detective Pratt with the investigation. On the Sunday following the murders, Det. Mathews conducted a photographic line up with a female witness who saw a man leaving the crime scene the night of the murders. She identified Defendant as the man that she saw and signed and dated the back of Defendant’s photograph. The witness was not threatened or coerced and was not under the influence of any narcotic or alcohol.
 

 Det. Mathews testified that he may have been the person who turned on the video and audio equipment during Defendant’s interrogation. He explained that there is no set rule on how the equipment is operated. He testified that it is not protocol to turn the equipment off after an interview if the suspect remains in the interrogation room because there is no expectation of privacy during interrogation. He stated that he was not the last detective in the interrogation room, and he did not recall if the equipment remained on during Defendant’s conversation with his mother.
 

 Officer Leary testified that the pellets recovered from the crime scene were single ought and double-ought buck shotgun pellets. He opined that a person shot with twenty single or double ought buckshot pellets could possibly have been shot more than one time or with more than one shell. Off. Leary examined the shotgun, a Savage Arms twelve gauge crack barrel that was seized from Defendant’s car. It contained one unspent shell in the barrel. Off. Leary opined that to load the gun, a release lever must be pushed to the right and the barrel pulled down. Once fired, the empty shell must be removed by hand and another shell inserted into the barrel.
 

 | nFor shotgun shell wadding to penetrate a victim’s body, the victim would have to be shot at close range from between ten or twelve feet away depending on the length of the barrel. Off. Leary also examined four spent copper coated lead shotgun pellets recovered from 18649 Cavalier Drive which were consistent with double ought buck size shotgun pellets, one spent copper coated lead shotgun pellet recovered from the body of Lionel Nelson which was consistent with double ought buck size shotgun pellets, five copper coated pellets too deformed for size determination, twenty copper coated lead shotgun pellets which were consistent with single ought buck size shotgun pellets, and one plastic shotgun wad recovered from the body of Marilyn Green.
 

 Off. Leary stated that the pellet removed from the body of Lionel Nelson was not a single slug but was consistent with double ought buckshot. Off. Leary was not aware that any single slugs were found at the crime scene. He explained that the difference between single and double ought buckshot is the size of the pellets. Off. Leary stated that it was possible for a shotgun shell to contain more than the usual fifteen pellets if the shell was recycled using a reloading machine. Off. Leary was unaware of any pellets that may have struck a parked vehicle or a neighbor’s house. He opined that a person could be shot once with a shotgun and still sustain more than one wound because of the spray of the pellets.
 

 On April 26, 2009, Defendant requested money from his friend, Orgie Collins. Defendant acknowledged that he knew about the murders, and he told Collins that after he ate breakfast he was going to turn himself in to the police.
 

 Defendant drove to Collins’s home at about 10:00 a.m. the day following the murders. Defendant asked Collins if he heard about what happened the previous day. Collins answered that Defendant’s mother had informed him of the shootings. 112Pefendant told Collins that he might
 
 *237
 
 drive to Baton Rouge before turning himself in to the police.
 

 Hilda Green, Defendant’s mother, testified that Defendant loved Marilyn. In March 2009, Defendant moved into her home after he separated from Marilyn. Defendant had several rifles and a handgun. Green testified that Defendant’s guns were used for hunting.
 

 Green testified that Defendant was never violent and was never in trouble. Green was surprised that Defendant would commit such a crime. Prior to Defendant moving into her home, Green saw the couple at Christmas and New Year’s Day when they came for dinner. Defendant and Marilyn were still seeing each other and communicating as late as February 2009. She remembered that Defendant and Cierra went out together for Mardi Gras.
 

 Defendant, Jackie Green, testified to the following:
 

 He met Marilyn Green in 1993; they began dating in 1994, and Defendant moved into her apartment in the B.W. Cooper Housing Development. Marilyn Green’s daughter, Cierra, was four or five years old. Defendant and Marilyn Green were married in February 2001, and he raised Cierra as his own daughter. In December 2001, the family moved into the home at 13649 Cavalier Drive. The first few years the marriage was wonderful. The couple did things together and were trying to make it like everyone else. Defendant began having financial trouble in 2004 when Marilyn quit her job at Hibernia Bank. Defendant’s oil field job slowed down, and he only worked three days per week. He stated that, “things were kind of loaded on me at that time.” He admitted that during an argument with Marilyn over a cell phone, he broke a window pane, and Marilyn called the police. 11sThe police told him to leave the home for the night. He went to his mother’s home. He and Marilyn discussed their problems and decided to move forward.
 

 Eventually, the couple filed for bankruptcy. Marilyn was very upset about the bankruptcy, and a lot of tension developed between the couple. The couple sought marriage counseling from their pastor. They were told that the main problem was communication and were instructed on how to work through their problems. When things got tough at home, Defendant went hunting with his father in Mississippi. Defendant had a number of guns at his home on Cavalier Drive and at his mother’s home. The guns at his mother’s house consisted of a twenty-two caliber rifle and a small shotgun. These guns were old and were hardly ever used.
 

 In February 2005, his marriage deteriorated again due to financial problems. Marilyn refused to sleep with him; he left the home but continued to contact Marilyn and Cierra. Defendant would often enter the family home, look around, and leave Marilyn money to pay bills. Following Hurricane Katrina, he evacuated to Florida. Cierra and Marilyn evacuated to Mississippi. Defendant returned to New Orleans in November 2005. He moved in with his mother and Orgie Collins in a three bedroom leased house in Metairie. At that time he received divorce papers from Marilyn. Family members encouraged Defendant to agree to the divorce; he signed the papers and returned them to Marilyn. Subsequently, he moved into a FEMA trailer on Monroe Street. Cierra would often ask him to visit because she missed him.
 

 In November 2006, Marilyn contacted Defendant to help her with a flat tire. They began dating again, and Marilyn asked Defendant if she could move into the FEMA trailer with him. Because he loved
 
 *238
 
 Marilyn and Cierra, he agreed to let them live with him; they moved back in with Defendant on a permanent basis in | ^January 2007. The marriage was wonderful, and Defendant opened his own cabinet business. Marilyn worked as a part-time dispatcher and in Defendant’s business. The couple talked about getting remarried. In September 2007, the family moved back into the renovated Cavalier Drive home. Defendant described his relationship with Marilyn as “real fine, real fine.”
 

 Following Hurricane Gustav in 2008, Defendant’s cabinet business began to slow down. In November 2008, Defendant closed the business, hoping that he could reopen later. Financial problems still plagued the couple, but their relationship was stable. Defendant sold his inventory to pay the bills. In January 2009, the couple was two months in default of their mortgage. Marilyn told Defendant that they needed $5600.00 or the bank would foreclose. Defendant borrowed money from his mother, and Marilyn borrowed money from her father to pay the late mortgage payments. The couple’s relationship continued to deteriorate. Marilyn moved into Cierra’s bedroom. In March 2009, Marilyn asked Defendant to leave the home. Defendant took some clothes and checked into a motel. He did not believe the separation was permanent because he and Marilyn had separated before and always got back together. Marilyn never told him that she did not want him anymore. He denied that Marilyn asked him for the house keys. He admitted that he would return to the home often, but would call Marilyn and tell her that he was coming over. They would speak briefly and then he would leave. On one occasion prior to the murders, Marilyn contacted Defendant and told him that he had some mail at the house. Defendant drove to the house to retrieve his mail. He tried to call Marilyn, but she did not answer the phone. When he arrived at the house, he did not see Marilyn’s or Cierra’s vehicles. He entered the house, retrieved the mail from Cierra’s bedroom, got a drink from the 11firefrigerator and left the house. Later, he returned to the house because Marilyn left a cell phone message that he had left the door open. He denied leaving the door open, and denied telling Cierra “That B-, I’m going to kill her” He also denied following Marilyn and Cierra in his car .on the night of April 10, 2009. On April 15, 2009, he went to the house. When Marilyn opened the front door, he saw a man sitting in the kitchen. He stated that he “kind of barged in the house ...” and asked Marilyn who the man was. The man got up, asked what was going on, and displayed a pistol he had in his waistband. Marilyn told Defendant that the man was a contractor; Defendant left the house. Marilyn never told Defendant that she was dating anyone or that she did not want him in her life anymore.
 

 On April 25, 2009, at approximately 10:00 p.m., he drove to the Cavalier Drive house because Marilyn asked him to remove an old car he had in the backyard. He did not call Marilyn because his cell phone had been disconnected. When he arrived at the house, he saw Cierra’s vehicle in the driveway. The lights were on in Cierra’s bedroom and the guest room. He rang the doorbell; no one answered. When he started walking back to his car, he saw the light go off in the guest bedroom. As he backed out of the driveway, he saw the light in Cierra’s bedroom go off. Defendant turned around, walked back to the house and rang the doorbell; no one answered. Defendant went to the side door and looked inside. The living room was dark. He walked back to the front of the house and looked into Cierra’s
 
 *239
 
 bedroom; he heard what sounded like Marilyn’s voice.
 

 Defendant tried to open the front door with his key; the door would not open. Using his key, Defendant entered the house through the side door. The kitchen light was on. Defendant walked to Cier-ra’s bedroom and pushed the door open. When he turned on the lights he saw Marilyn having sex with the male | ¶ ¿victim, Lionel Nelson. Nelson yelled, “Get the f- - - out of here you fat mother f--.” Defendant testified that his “mind snapped”. He went into the master bedroom and retrieved a shotgun from under the mattress. The shotgun shells were in a pouch on the butt of the gun. Lionel Nelson ran into Cierra’s bathroom and locked the door; Marilyn ran into the living room. When she saw Defendant, she ran to the front door; Defendant grabbed her and asked, “... why you doing this? Why you got this guy in the house? What is going on here?” Nelson came out of the bathroom and came toward Defendant; Defendant fired two shots, striking Nelson. Marilyn ran out the front door. Defendant reloaded the shotgun and shot Marilyn. Defendant described the entire shooting as taking about three minutes. Defendant left the scene and drove to Gulfport, Mississippi where he pulled into a truck stop. He testified that he “... just drove, was disoriented, you know. I wasn’t thinking straight, you know.”
 

 Early the next morning, Defendant drove to Slidell, checked into a motel, and telephoned his father. Around 10:00 a.m., he left the motel and drove to his grandmother’s house and Orgie Collins’s house to get money for gas. He intended to return to the motel and turn himself in to the police the next day. As he approached the Highway 11 exit, a police officer in a marked unit began to follow him. When he crossed the twin span he stopped on the shoulder of the road, removed the empty shell from the shotgun, reloaded the shotgun and tried to kill himself; the gun did not fire. Defendant exited the car, put his hands in the air, and lay on the ground. He was handcuffed, arrested, and transported to police headquarters where he was asked if he wanted to give a statement; he agreed to give a statement. He denied knowing that the statement was being videotaped, and he did not know that his conversation with his mother was being videotaped. He 117testified, “I was still out of my mind. I was saying stuff that I normally — that’s not me. That’s not my character. That’s not me. That’s not my character. That’s not what I’m made of. This ordeal had me hyped up. I didn’t calm down until about two weeks later after I was locked up in Parish Prison. I didn’t really know where I was. I was trying to give them a statement. I said some things on videotape that I shouldn’t have, that I didn’t mean nothing by it, just talking.” He testified that he regretted what he did and did not go to the house that night to hurt Marilyn or anyone else. He denied ever threatening Marilyn and said that he still loved her.
 

 Defendant admitted that he left Marilyn on the front lawn after he shot her. He drove to Mississippi, Slidell and back to his mother’s house but did not turn himself in to the police. He insisted that he intended to turn himself in, but needed to get away for a little while before he made the decision. He admitted that Marilyn was no longer his wife when he killed her. He believed the man he saw in the kitchen on April 15, 2009, was the male victim, Lionel Nelson. He told his mother and the police that he intended only to hit Nelson with the butt of the shotgun, but admitted that he loaded the shotgun and shot Nelson. He admitted that he told his mother that he gave “that b-a dose”, “knocked fire
 
 *240
 
 from her”, and would have killed Cierra if she had been in the house.
 

 Defendant testified that he did not mean it when he said that he would have killed Cierra, and if she had been there, the shootings would not have happened.
 

 ERRORS PATENT
 

 A review for errors patent reveals none.
 

 SUFFICIENCY OF EVIDENCE
 

 | lsDefendant argues that the verdicts of second-degree murder are “irrational” because the mitigating factors of “sudden passion” or “heat of blood” introduced at trial only support verdicts of manslaughter.
 

 In evaluating whether evidence is constitutionally sufficient to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Green,
 
 588 So.2d 757 (La.App. 4th Cir. 1991). However, the reviewing court may not disregard this duty simply because the record contains evidence that tends to support each fact necessary to constitute the crime.
 
 State v. Mussall,
 
 523 So.2d 1305 (La.1988). The reviewing court is not permitted to consider just the evidence most favorable to the prosecution but must consider the record as a whole since that is what a rational trier of fact would do. If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier’s view of all the evidence most favorable to the prosecution must be adopted. The fact finder’s discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.
 
 Mussall,
 
 523 So.2d at 1309-1310. “[A] reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence.”
 
 State v. Smith,
 
 600 So.2d 1319, 1324 (La.1992).
 

 A fact-finder’s credibility decision should not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Huckabay,
 
 2000-1082 (La.App. 4 Cir 2/6/02), 809 So.2d 1093;
 
 State v. Harris,
 
 99-3147 (La.App. 4 Cir. 5/31/00), 765 So.2d 432. The testimony of a single witness, if believed by the trier of fact, is sufficient to support a conviction.
 
 State v. White,
 
 28,-095 (La.App.2d Cir.5/8/96), |19674 So.2d 1018.
 

 Conflicting statements as to factual matters is a question of weight of the evidence, not sufficiency.
 
 State v. Jones,
 
 537 So.2d 1244 (La.App. 4 Cir.1989). Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness.
 
 Id.
 
 A trier of fact’s determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence.
 
 State v. Vessell,
 
 450 So.2d 938 (La.1984).
 

 Defendant was convicted of two counts of second-degree murder, which is defined in pertinent part as: “the killing of a human being: 1) when the offender has a specific intent to kill or to inflict great bodily harm.” La. R.S. 14:30.1.
 

 Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. La. R.S. 14:10(1);
 
 State v. Lindsey,
 
 543 So.2d 886 (La.1989).
 

 The determination -of whether the requisite intent is present in a criminal case is for the trier of fact.
 
 State v.
 
 
 *241
 

 Huizar,
 
 414 So.2d 741 (La.1982);
 
 State v. Butler,
 
 322 So.2d 189 (La.1975). In reviewing the correctness of such a determination, the court should review the evidence in a light most favorable to the prosecution and must determine if the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense.
 
 Jackson v. Virginia; State v. Huizar.
 

 Pursuant to La. R.S. 14:31(A)(1), manslaughter is:
 

 A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce aj^homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed.
 

 It has long been held that “heat of blood” and “sudden passion” are not elements of the offense of manslaughter but are mitigating circumstances which may serve to reduce the grade of a homicide.
 
 State v. Tompkins,
 
 403 So.2d 644 (La. 1981).
 

 The record reflects that while Defendant and his ex-wife, Marilyn Green, lived together on and off prior to the shootings, they had been divorced for approximately four years. Defendant’s testimony, as well as that of his step-daughter, Cierra Williams, reflects that the relationship between Defendant and his ex-wife was unstable for many years prior to the murders. They engaged in violent verbal arguments, and Defendant made verbal threats to Marilyn. Fifteen days before the murders, Defendant, in a cell phone call, verbally threatened to kill Marilyn. During that incident, Defendant, unprovoked, followed Cierra and Marilyn in his car, bumping the back of the car and demanding to speak to Marilyn on Cierra’s cell phone. When Marilyn refused to speak to him, he told Cierra that he was going to kill the “b-”. Williams reported the incident to the police, but Defendant denied the threat. This incident, which occurred shortly before the murders, indicates that Defendant was capable of engaging in violent actions directed at Marilyn. Cierra testified that her mother asked Defendant for his house key because she did not want him entering the house; Defendant denied this. Defendant testified that he would always ring the doorbell before entering the house. However, Defendant contradicted this testimony by admitting that he entered the house using his key to retrieve his mail when he thought no one was home.
 

 121 On the night of the murders, Defendant heard Marilyn engaging in sex, and by her turning the lights off, he was aware that she did not want to answer the door. Disregarding the obvious, Defendant, uninvited, used his key to enter the house through the kitchen door. He knew where Marilyn and Nelson were and what they were doing; he went directly to the bedroom where he heard Marilyn’s voice. Accordingly, it was not unreasonable for the jury to conclude that Defendant was not suddenly surprised when he saw the victims engaged in sexual intercourse. Furthermore, Defendant admitted that the shotgun was not loaded when he retrieved it from under the mattress, and that the shells were inside of a pouch attached to the butt of the gun. Further, the firearms testimony indicated that the murder weapon had to be opened and loaded one shell
 
 *242
 
 at a time. Each spent shell had to be removed before another live shell was inserted. During the time it took Defendant to load the shotgun, Lionel Nelson had sufficient time to dress and lock himself inside the bathroom in the hall; Marilyn had time to go into the living room area, dress, break free of Defendant’s grasp, open the front door, and attempt to flee from the house. Nelson was shot when he exited the bathroom after hearing Marilyn scream; Marilyn was shot after fleeing from the house. Defendant testified that he only shot each victim once. However, prior to being transported the hospital, Nelson told Detective Smith that he was shot twice. Also, the forensic testimony indicated that each victim was shot twice at close range. Nelson was shot once in his left thigh and once in his chest, and Marilyn was shot once in the back of her arm and once in her chest. Defendant had to open the shotgun a minimum of four times, load it four times, and unloaded it four times to shoot the victims. Thus, Defendant had sufficient time to reflect on his actions. The record does not support Defendant’s contention of provocation and that he “snapped.” |22The evidence presented was sufficient to prove that Defendant had the specific intent to kill or to inflict great bodily harm before entering the house. The verdicts indicate that the jury rejected Defendant’s version of the facts. We find that this assignment of error is without merit.
 

 ADMISSIBILITY OF EVIDENCE
 

 Defendant argues that the trial court erred in admitting into evidence the video/audio recording of the conversation with his mother in violation of his right to privacy and the Louisiana Electronic Surveillance Act, La. R.S. 15:1301, et seq. relative to the disclosure of wire, electronic, or oral communications.
 
 [1]
 

 An appellate court will only review issues that were submitted to the trial court. Rule 1-3, Uniform Rules, Courts of Appeal. See also C.Cr. P. art. 841. As a corollary to the contemporaneous objection rule, the error must have been pointed out to the trial judge, and a defendant is limited on appeal to grounds for the objection articulated at trial.
 
 State v. Jackson,
 
 450 So.2d 621 (La.1984). Defense counsel failed to object to the admission of the recorded statement between Defendant and his mother as a violation of the Louisiana Electronic Surveillance Act either in the motion to suppress the statement, at the motion to suppress hearing, or at trial. Defense counsel’s questioning of the witnesses addressed Defendant’s reasonable expectation of privacy, not a surreptitious recording of Defendant’s conversation. Accordingly, this issue has not been preserved on appeal.
 

 LjjEven assuming, arguendo, that the recorded conversation with his mother should have been suppressed, the error is harmless because the trial court’s actions amounted to no more than harmless error that would not have changed the outcome of the trial. The jurisprudence provides that a trial error does not provide grounds for reversal of a defendant’s conviction and sentence unless it affects substantial rights of the accused. La. C.Cr.P. art. 921;
 
 State v. Johnson,
 
 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-102. The test is whether there is a reasonable possibility the error might have contribut
 
 *243
 
 ed to the conviction and whether the court can declare a belief that the error is harmless beyond a reasonable doubt.
 
 State v. Juniors,
 
 2003-2425, p. 54 (La.6/29/05), 915 So.2d 291, 331. The reviewing court must find that the verdict actually rendered was surely not attributable to the error.
 
 Johnson,
 
 94-1379, pp. 16-17, 664 So.2d at 101-102. In the instant case, the only outcome unfavorable to Defendant would have been that the jury, after hearing Defendant’s conversation with his mother, did not believe Defendant “snapped” to support the responsive verdicts of manslaughter. As previously addressed, Defendant’s conviction rests on sufficient evidence even in the absence of the recorded conversation with his mother, to support the instant convictions. Accordingly, the admission of Defendant’s recorded conversation with his mother cannot reasonably be said to have contributed to the verdicts.
 

 In
 
 State v. Davis,
 
 96-1659 (La. App. 4 Cir. 11/27/96), 684 So.2d 540, this Court addressed a suspect’s privacy rights pursuant to Art. I, Section V of the Louisiana Constitution as follows:
 

 “... the Louisiana Constitution only protects against unreasonable invasions of privacy. The basic test for determining whether a person’s constitutional right to privacy has been violated is 1) whether there was a reasonable expectation of privacy and 2) whether society |24⅛ ready to accept that expectation of privacy as reasonable.” (citation omitted).
 

 In
 
 State v. Hussey,
 
 469 So.2d 346 (La. App. 2d Cir.1985), two passengers were placed in the backseat of a police car to be driven to the police station because they and the driver were too intoxicated to move their vehicle off of the highway. A hidden tape recorder recorded their conversation during which they discussed stolen items that were in the vehicle they were driving. Based on the tape recording, the passengers were arrested and charged. The appellate court upheld denying the defendants’ motion to suppress the tape recording because the defendants did not have a reasonable expectation of privacy while in the rear seat of the police car.
 

 Davis had less of an expectation of privacy. He was not just a passenger in a police care, but had been placed under arrest and given his
 
 Miranda
 
 rights. Once arrested, the police car became Davis’s temporary jail in which he had no reasonable expectation of privacy.
 

 In the instant case, Defendant agreed to give a recorded audio/video statement to the police as to the events leading to the murders. He spoke to his mother in the same interrogation room where he gave his recorded confession to the police. The video camera was on the wall, and none of the recording equipment had been removed from the room. Defendant was not told that his conversation with his mother was private. Detective Barnes briefly stepped out of the room, but returned within minutes to ask Defendant about his clothes. Therefore, no indicia of privacy were present. Detective Barnes testified that Defendant knew the video camera was on because he kept looking at it during the interview. Furthermore, Defendant waived his
 
 Miranda
 
 rights and had already confessed to the murders. As in
 
 Davis,
 
 the interrogation room became Defendant’s temporary jail in which he had no reasonable expectation of privacy while speaking to his mother. Defendant’s argument that he had a reasonable expectation of privacy is without merit.
 

 ^DECREE
 

 We find that the evidence presented was sufficient to prove that Defendant had the specific intent to kill or to inflict great
 
 *244
 
 bodily harm before entering the house, and the verdicts indicate that the jury rejected Defendant’s version of the facts. Further, we find that the trial court did not err in admitting into evidence the video/audio recording of Defendant’s conversation with his mother. Defendant’s convictions and sentences are affirmed.
 

 CONVICTIONS AFFIRMED; SENTENCES AFFIRMED
 

 [1]
 

 . La. R.S. 15:1303 provides in pertinent part:
 

 (A) Except as otherwise specifically provided in this Chapter, it shall be unlawful for any person to:
 

 (1) Willfully intercept, endeavor to intercept, or procure any other person to intercept or endeavor to intercept, any wire or oral communication....