CARAWAY, J.
hKimethia Coleman was charged with second degree murder, a violation of La. R.S. 14:30.1, and a jury convicted her as charged. The trial court sentenced Coleman to the mandatory sentence of life imprisonment at hard labor without parole, probation or suspension of sentence. Coleman appeals her conviction raising four assignments of trial error. We affirm.

Facts

On January 17, 2010, just before 4:00 a.m., Coleman called Caddo Parish 911 from the apartment of her boyfriend, Brian Spinks, in Shreveport. Spinks was in the United States Air Force and had dated Coleman for over a year. Police discovered Spinks partially blocking the front door of the apartment. He had been stabbed 64 times in the upper torso and his throat had been slashed. Spinks expired at the scene. An autopsy revealed that the victim received two fatal wounds including a 3-inch stab wound at the base of the neck and an incised wound in the front of the neck.[1]
The living area of the apartment where Spinks lay on his back was doused in blood. Two kitchen knives, one broken and one intact, from the kitchen butcher block holder, were found on the floor in this room. Coleman was covered in blood and was crying and upset. She had a knife wound in her right mid-abdomen, another in her lower left abdomen, a cut |2on one hand and two cuts on each thigh.[2] Coleman was able to tell the officers that a “black” guy with “dreads,” or dreadlocked hair, followed her to Spinks’ apartment and inflicted the fatal wounds. Nevertheless, police were unable to locate a third person assailant.
Coleman was transported to a hospital for treatment of her minor wounds and then transferred to the Shreveport police department at approximately 7:00 a.m. She spoke with officers who described her *706 emotions as fluctuating wildly. Eventually, Coleman was given her rights and executed a waiver. During her recorded interview, Coleman requested several times to speak with her mother by telephone.
Coleman initially told police that earlier in the evening she had gone out with friends to different clubs. Near the end of the evening, at approximately 2:00 a.m., she ran into Spinks, who was also out for the evening with friends. Coleman indicated that because she and Spinks had an agreement not to be in the same bar when they went out separately, she approached him at the club and told him not to be angry with her. Other witnesses in the bar indicated that Coleman was angry when she approached Spinks and threatened to “whoop his ass.”
After the encounter, Spinks left the bar and tried to call Coleman.[3] The phone message indicated that Spinks called Coleman to “tell [her] that |3we’re done.” Coleman did not hear the phone call but later tried to call Spinks before going to his apartment.
During her questioning by police, Coleman first indicated that while she and Spinks were in the back bedroom of the apartment talking, an intruder forced his way into the apartment and began attacking Spinks with a knife. As she had done earlier, Coleman described the intruder as a black man with dreadlocks whom she knew only by his first name, John.
During her interview, when confronted by Spinks’ phone message, Coleman became angry with police detectives. She interviewed with one officer for an hour and a half before requesting to speak alone with another detective. During this private 10-15 minute interview, Coleman told the detective that Spinks had hit her before that evening and she was embarrassed about that fact. She indicated that after she arrived at Spinks’ apartment, the two began arguing in the bedroom when Spinks grabbed her by the throat, pinched her hand and stabbed her four or five times. After the initial argument, she was able to break away, but Spinks went into the kitchen, came back and continued to argue with her. She explained that Spinks then stabbed her in the legs and torso with a kitchen knife. Coleman then said that she went into the kitchen to get a knife of her own before she and Spinks began fighting in the living room. She said that she took the knife away from Spinks and, according to the detective, “had to do what she had to do.”[4] Coleman then again indicated that the person named John[5] ^entered the apartment and continued to stab Spinks. At that point, she requested an attorney and the interview was terminated.
Coleman was then allowed to use a telephone in the detective’s office to call her mother. Calls on these phones are recorded at the discretion of the officers, and the phones have a sticker informing the user of that fact. The detective chose to record *707 Coleman’s call. In this phone call, Coleman informed her mother that she did not believe she was being recorded. She also said that she had told the police a story about a guy coming in and then changed her story to claim self-defense. The detective was standing in the doorway of his office but did not hear the conversation.
Coleman was initially charged with manslaughter and subsequently indicted on February 25, 2010, for second degree murder. She pled not guilty and not guilty by reason of insanity.[6]
On April 5, 2011, Coleman’s counsel filed a motion for the appointment of a sanity commission urging that Coleman did not have the ability to proceed due to a suspected mental problem. The trial court found Coleman incompetent to proceed and transferred her to the Feliciana Forensic Facility for 90 days. Coleman returned to court on November 2, 2011, and was then found competent to stand trial. That same day, the matter was set for trial on April 23, 2012.
Coleman’s counsel sought three continuances of the trial which were denied by the trial court.
| ⅞ Coleman also filed a number of pretrial motions including a motion to suppress her statements to police and to her mother on the grounds that she was in a state of shock and the statements were not freely and voluntarily given. That motion was heard and denied by the trial court.
Trial commenced on April 23, 2012. At trial, Coleman testified that on the night of the murder when she got to Spinks’ apartment, he told her, “I told you not to go the club, you should listen to me,” and began to choke her while the two were in the bedroom. Coleman claimed that her relationship with Spinks had become abusive. Coleman testified that Spinks left the room and got a knife from the kitchen. She claimed that she fought with Spinks over the knife and that Spinks inflicted stab wounds on her sides, stomach and leg. Thereafter, Coleman claimed that she went into the kitchen and got a knife for herself. According to Coleman; the two began fighting with the knives in the living room, and she defended herself by stabbing Spinks “because he was trying to attack me. He was trying to kill me.”
Coleman said that the victim grabbed her in an effort to keep her there. She could not remember all of the ensuing events, including how many times she may have stabbed Spinks, explaining that “I must have blanked out.” Coleman admitted that she lied during the 911 call because she was scared and shocked. She also admitted that she lied to police about another individual stabbing Spinks.[7]
|fiThe jury unanimously convicted Coleman of second degree murder. After imposition of the mandatory life sentence, Coleman appealed.

Discussion

We will first consider Coleman’s assignment of error on the motion to suppress. Coleman urges that the court should have excluded both her statement to police and her conversation with her mother because her consent to make the statement to po *708 lice was not freely and voluntarily given and her right to privacy was violated by admission of her statement to her mother. Specifically, Coleman argues that during the interrogation the detective and others “engaged in overreaching conduct, including the use of fear, duress, intimidation, menaces, threats, inducements and/or promises.” Coleman urges that factors such as her initial refusal to sign the waiver form, the charge of murder, her lack of sleep, hysteria and injury, and her constant requests to speak to her mother rendered her waiver and statements involuntary and inadmissible. Coleman also argues that her statements to her mother were inadmissible because she possessed a reasonable expectation of privacy in the detective’s office as she was left there alone and did not know that the call was being monitored. Further, Coleman argues that the recorded communications were prohibited by the Electronic Surveillance Act.
Louisiana Code of Evidence Article 703 provides, in part:
B. A defendant may move on any constitutional ground to suppress a confession or statement of any nature made by the defendant.
[[Image here]]
D. On the trial of a motion to suppress filed under the provisions of this Article, the burden of proof is on the defendant to prove the ground of his motion, except that the state shall have the burden of | .¡proving the admissibility of a purported confession or statement by the defendant or of any evidence seized without a warrant.
[[Image here]]
G. When a ruling on a motion to suppress a confession or statement is adverse to the defendant, the state shall be required, prior to presenting the confession or statement to the jury, to introduce evidence concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
A ruling made adversely to the defendant prior to trial upon a motion to suppress a confession or statement does not prevent the defendant from introducing evidence during the trial concerning the circumstances surrounding the making of the confession or statement for the purpose of enabling the jury to determine the weight to be given the confession or statement.
At a hearing on a motion to suppress a confession, the state bears the burden of proving beyond a reasonable doubt the free and voluntary nature of the confession. State v. Hills, 354 So.2d 186 (La.1977); State v. Callier, 39,650 (La.App.2d Cir.7/27/05), 909 So.2d 23, writ denied, 06-0308 (La.9/1/06), 936 So.2d 196; State v. Collier, 34,774 (La.App.2d Cir.6/20/01), 792 So.2d 793, writ denied, 01-2199 (La.6/7/02), 817 So.2d 1142.
Before what purports to be a confession can be introduced into evidence, the state must affirmatively prove that it was free and voluntary and not made under the influence of fear, duress, intimidation, menaces, threats, inducements or promises. La. R.S. 15:451. The state must also establish that an accused who makes a statement during custodial interrogation was first advised of his or her Miranda rights.[8] State v. Callier, supra; *709 State v. Collier, supra; State v. Walker, 28,577 (La.App.2d Cir.10/4/96), 681 So.2d 1028.
^Interrogation is “... questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.” Miranda, supra. Interrogation includes words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); State v. Callier, supra.
In determining whether a ruling on a motion to suppress is correct, an appellate court is not limited to evidence adduced at the hearing on the motion, but also may consider pertinent evidence given at trial. State v. White, 39,681 (La.App.2d Cir.5/11/05), 903 So.2d 580; State v. Daniels, 614 So.2d 97 (La.App. 2d Cir.1993), writ denied, 619 So.2d 573 (La.1993). The trial court is afforded great discretion in ruling on a motion to suppress, and its ruling will not be disturbed absent an abuse of that discretion. State v. Lee, 05-2098 (La.1/16/08), 976 So.2d 109, cert. denied 555 U.S. 824, 129 S.Ct. 143, 172 L.Ed.2d 39 (2008). Likewise, a trial judge’s ruling on whether or not a statement is voluntary is given great weight and will not be disturbed on appeal unless clearly unsupported by the evidence. State v. Vigne, 01-2940 (La.6/21/02), 820 So.2d 533. Great weight is placed upon the trial court’s ruling on a motion to suppress because it had the opportunity to observe the witnesses and weigh the credibility of their testimony. State v. Williams, 46,842 (La.App.2d Cir.3/14/12), 87 So.3d 949; State v. Crews, 28,153 (La.App.2d Cir.5/8/96), 674 So.2d 1082, citing State v. Jackson, 26,138 (La.App.2d Cir.8/17/94), 641 So.2d 1081.
Both the Fourth Amendment to the United States Constitution and La. Const, art. I, § 5 protect people and their privacy against unreasonable governmental intrusion. State v. Durham, 43,558 (La.App.2d Cir.10/15/08), 996 So.2d 642. The test for determining whether one has a reasonable expectation of privacy is not only whether the person had an actual or subjective expectation of privacy, but also whether that expectation is of a type which society at large is prepared to recognize as being reasonable. State v. Jackson, 09-1983 (La.7/6/10), 42 So.3d 368.
Police recordings of a phone conversation between a suspect and a family member have been held not to be the equivalent of an interrogation and the actions of the police in permitting such a conversation is not coercive. Arizona v. Mauro, 481 U.S. 520, 107 S.Ct. 1931, 95 L.Ed.2d 458 (1987); State v. Leger, 05-0011 (La.7/10/06), 936 So.2d 108, cert. denied, 549 U.S. 1221, 127 S.Ct. 1279, 167 L.Ed.2d 100 (2007). A phone conversation between the defendant and his mother in an interrogation room which contained video equipment and where the defendant had earlier waived his rights, confessed to murder, was not told that his conversation was private and the officer stepped out of the room but stepped back in, was held not to violate defendant’s right to privacy. State v. Green, 10-0454 (La.App.4th Cir.3/16/11), 62 So.3d 229, writ denied, 11-0801 (La.2/10/12), 80 So.3d 476.
|10For the first time in this appeal, Coleman raises the Louisiana Electronic Surveillance Act, La. R.S. 15:1301 et seq., as affording protection for her phone call to her mother. Louisiana courts have long held a defendant may not raise new grounds for suppressing evidence on appeal that he did not raise at the trial court in a motion to suppress. State v. Brown, *710 434 So.2d 399 (La.1983); State v. Sinclair, 45,625 (La.App.2d Cir.11/3/10), 55 So.3d 47, writ denied, 10-2718 (La.4/29/11), 62 So.3d 110. Moreover, articulating a new basis for the motion to suppress for the first time on appeal is prohibited under La. C.Cr.P. art. 841, since the trial court would not be afforded an opportunity to consider the merits of the particular claim. State v. Sinclair, supra. Coleman’s failure to raise a violation of the Louisiana Electronic Surveillance Act either at trial or in a motion to suppress fails to preserve the issue for appellate review. State v. Green, supra.
At the hearing on the motion to suppress, Shreveport Police Detectives Lowell Bowen, Farquhar and Holmes testified. The three officers were present during Coleman’s initial interviews. At trial, only Detectives Bowen and Farquhar testified. Coleman’s statements and conversation with her mother were introduced into evidence.
Bowen, the primary detective on the case, testified that prior to the initial police questioning of Coleman at the police station, she was read her rights. He stated that “eventually” during the initial conversation, Coleman told him that she understood and agreed to waive those rights and make a statement to him. She signed a waiver form. Bowen testified that he also 1, tasked Coleman if she was on drugs or had been drinking. Coleman informed him that she had one Long Island Iced Tea that evening but was not intoxicated. She also informed Bowen that she had a college education. The tape of the interrogation confirms Bowen’s testimony.
Notably, at one point in the initial interview, before she signed the waiver, Coleman was reluctant to acknowledge that she understood her rights and would not answer questions. It was then that Bowen wrote the word “failed” on the waiver form which he immediately marked out as Coleman changed her mind and agreed to waive her rights. Bowen testified that he never promised Coleman anything in order to get her to make a statement, nor did he harass or threaten her in any way or use physical force against her to force her to speak. Coleman never indicated that she was ill, thirsty or hungry. Although she appeared alert during the interview, her emotions “changed” according to Bowen.
Bowen testified that Detectives Eric Farquhar and Shonda Holmes, and Agent Jeffrey Dunkle of the Air Force Office of Special Investigations were present during the initial interview of Coleman. Dunkle was brought in because Spinks was a member of the Air Force. Bowen testified that none of the other individuals present during the interview threatened or harassed Coleman. Throughout the interview, Coleman asked to speak with her mother. Bowen informed her that she would be able to do so after she completed the interview.
11?Bowen testified that Coleman’s mother was not at the police station and Coleman requested to speak to her by phone. Coleman was eventually allowed to call her mother from Detective Farquhar’s Office.
Bowen stated that when he asked Coleman questions, her “answers were very aggressive.” He testified that during the interview Coleman “did appear to be crying, but there was no other signs,” referring to tears. When Detective Farquhar questioned her, however, Bowen stated that “her emotions changed to a calmer, relaxed” mood. Bowen specifically indicated that when he asked Coleman about Spinks breaking up with her, “she turned with the angered look as if I had struck a nerve.”
Bowen interviewed Coleman for an hour and a half. At one point, Coleman asked to speak with Detective Farquhar by her *711 self and her request was granted. Everyone but the detective and Coleman stepped out of the conference room, which had one-way viewing glass to ensure officer safety. The officers were able to see into the room but Detective Farquhar and Coleman could not see out of it. The room provided no exterior audio. Bowen testified that the interview between Coleman and Far-quhar lasted about 10 minutes. After the interview, Coleman requested legal counsel.
Bowen stated that it was after the interview that Coleman was taken to Detective Farquhar’s office to call her mother. Bowen stated that Detectives Farquhar and Holmes were “standing by in the hallway,” when Coleman spoke with her mother.
On cross-examination, Bowen agreed that Coleman was “agitated.” He described her voice as “raised and it was back and forth with emotion.” 11sBowen stated that Coleman “wanted to talk to her mother, she wanted to know how Brian was doing.” She requested to speak to her mother “four to five” times at the beginning of the interview and “then throughout it a couple of times.” Bowen insisted that he did not put pressure on Coleman to sign the waiver form. He did not “entice” her to sign it so that she could speak to her mother. Bowen stated that during the interview, Coleman developed a bond with Detective Farquhar. He conceded that she gave a different story to Farquhar including a claim of self-defense.
Bowen additionally testified that before her waiver, he told Coleman that he was going to charge her with murder because Spinks was dead. He stated that Coleman became angry and began cursing when she referred to John. Bowen testified that he told Coleman he did not believe her story.
At the motion to suppress, Detective Farquhar testified that he witnessed the reading of rights to Coleman at the police station. He heard her acknowledge her understanding of those rights and her agreement to waive her rights and give a statement. Detective Farquhar corroborated Detective Bowen’s statements that Coleman’s emotions fluctuated during the interview. He stated that at times she was calm, and at other times she cried. Detective Farquhar corroborated Detective Bowen’s version of Coleman’s initial story. He also confirmed that at some point Coleman requested to speak to him alone. At this point, Coleman informed the detective that she was embarrassed to let anyone else know that she had been beaten by Spinks before and that he stabbed her four or five times that evening. She never admitted that she stabbed Spinks, but indicated that she 114did what she had to do. Coleman was not hysterical during the interview, although she cried at certain points. Detective Farquhar indicated that Coleman was articulate and could respond appropriately when questioned. After her statements to him, Coleman requested an attorney.
Coleman was then allowed to use Detective Farquhar’s office telephone to call her mother. The call was recorded. Detective Farquhar testified that some of the calls made from the department are recorded. The office lines have a “user recording device.” It was his choice to turn the recorder on when Coleman spoke with her mother. He did not advise her that the call was recorded, but the telephone had “a little sticker” on it that indicated that calls were subject to monitoring. Detective Farquhar testified that the sticker was on the back portion of the telephone handset. He spoke -with Coleman’s mother after she talked with her.
At the motion to suppress, the defense argued that Coleman’s statements were not freely and voluntarily given because *712 she was not allowed to speak to her mother before the interview was completed, she was threatened with second degree murder charges and initially declined to speak with the officers. The defense also questioned the voluntariness of the statements based upon Coleman’s injuries and the fact that she had been through a horrible event.
The court ruled that Coleman was an adult, college-educated person who stated that she had little to drink that evening. Although the evidence showed that she did request to talk to her mother, the court ruled that there were no legal grounds to conclude that the officer’s refusal to allow her to [ 1sdo so at the time of the statement coerced her into making any statements. The court also acknowledged that the officers told Coleman that she would be charged with second degree murder. The court considered the fact that Coleman was able to give very coherent statements concerning “the mystery person named John.” The court also noted that each of the officers noted the lack of tears coming from Coleman and concluded that she was “fake crying.” The court observed that Coleman was very articulate and fully aware of what was going on and that she understood that when she invoked the right to an attorney, the interview would stop. For these reasons, the court found that Coleman knowingly and intelligently waived her rights and freely and voluntarily made statements to police.
The court deferred ruling on the issue of the admissibility of the statements Coleman made to her mother and requested that Detective Farquhar produce the phone handset and warnings. The following day, Detective Farquhar was questioned about the office phone that Coleman used when she spoke to her mother. The detective read the label on the phone, which read “all phone calls are subject to monitoring and recording,” for the court. A photograph of the language was offered and introduced in to evidence. Detective Farquhar testified that he placed the sticker on the phone. He stated that no other person was in his office when Coleman spoke on his telephone. He recalled that Coleman told her mother that the phone call was not recorded. The door was open and he stood outside the door about five or six feet away from Coleman. He did not pay attention to |1fiwhat Coleman said to her mother. The phone call took place after Coleman requested an attorney.
After hearing this testimony and considering the evidence, the court denied that portion of Coleman’s motion to suppress dealing with the statements made to her mother. The court determined that an adult in her mid-20s with a college degree should not have had a reasonable expectation of privacy while using an officer’s phone with an open door with a detective standing within 5 feet of her.
The record does not demonstrate error in the court’s determination that Coleman’s recorded statement to police was voluntary. Three officers testified about the circumstances leading to the defendant’s statement, and the statement was recorded. While the recorded interview reveals a sometimes emotional defendant, it also presents a coherent, articulate individual who was able to respond appropriately to the interrogation. Thus, Coleman, although upset, was not apparently intoxicated or so distraught that she could not make a rational choice to waive her rights and speak to police. The voluntariness of Coleman’s choice to waive her rights and speak to police is apparent from the record, and the district court’s decision to allow the statement into evidence cannot be said to be erroneous.
As for the defendant’s conversation with her mother, it is clear that al *713 though Coleman did not clearly understand that the call was being recorded, she nevertheless proceeded to speak with her mother in an open office in close proximity to two detectives. Moreover, the warning attached to the telephone clearly informed any caller that the call could be monitored |17or recorded. She understood that she was charged with a crime and in police custody. These facts are sufficient to demonstrate that any reasonable expectation of privacy Coleman had with regard to the recording of her conversation was counterbalanced by her knowledge that she was in a public place where the conversation could easily be heard. In these circumstances, we find no error in the trial court’s determination that the recording did not amount to an unreasonable invasion of privacy. This assignment of error is without merit.
Coleman’s next assignment of error alleges that the trial court committed reversible error when it refused to allow testimony from a witness who overheard the victim make what might be construed as a veiled threat toward the defendant several months prior to this incident. She also claims that the trial court improperly limited the testimony of her expert witnesses.
Louisiana Code of Evidence Article 404 provides, in part:
A. Character evidence generally. Evidence of a person’s character or a trait of his character, such as a moral quality, is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
[[Image here]]
(2) Character of victim, (a) Except as provided in Article 412, evidence of a pertinent trait of character, such as a moral quality, of the victim of the crime offered by an accused, or by the prosecution to rebut the character evidence; provided that in the absence of evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, evidence of his dangerous character is not admissible; provided further that when the accused pleads self-defense and there is a history of assaultive behavior between the victim, and the accused and the accused lived in a familial or intimate relationship such as, but not limited to, the husband-wife, parent-child, or concubinage relationship, it shall not be necessary to first show a hostile demonstration or overt act on the part of the victim in order to introduce evidence of the dangerous character of\1Rthe victim, including specific instances of conduct and domestic violence; and further provided that an expert’s opinion as to the effects of the prior assaultive acts on the accused’s state of mind is admissible.
La. C.E. art. 404(A)(2), emphasis supplied.
In State v. Rodrigue, 98-1558 (La.4/13/99), 734 So.2d 608, the supreme court explained:
Thus evidence of a person’s character generally is inadmissible to prove that the person acted in conformity with his or her character on a particular occasion. However, there are several specific exceptions to this general rule. With respect to evidence of the dangerous character of the victim of a crime, such evidence is admissible (1) when the accused offers appreciable evidence of a hostile demonstration or an overt act on the part of the victim at the time of the offense charged, or (2) when the accused, relying on the defense of self-defense, establishes (a) a history of as-saultive behavior between the victim and the accused and (b) a familial or intimate relationship between the victim and the accused. When the latter exception has *714 been established, the accused may offer evidence of specific instances of dangerous conduct and domestic violence without establishing a hostile demonstration or overt act by the victim.
The court referred to paragraph (2) of Article 404 as the domestic violence exception, for which it is not necessary that the accused present appreciable evidence of a hostile demonstration or overt act by the victim at the time of the offense charged to introduce evidence of the victim’s dangerous character. In Rodrigue, the defendant was convicted of second degree murder although she claimed self-defense after stabbing her former boyfriend. The two had lived together for six months but separated only two weeks before the incident. Evidence of at least one prior 911 emergency call was placed before the court by an investigating police officer and the defense offered further evidence of alleged assaultive behavior. Defendant’s sister testified that the two were “boyfriend and 11;igirlfriend,” and the victim’s sister referred to the victim’s house as “their house.” The defendant’s mother was not allowed to discuss the relationship after the prosecutor’s objection interrupted her testimony.
In reversing the exclusion of the character evidence and the trial court’s measure of the parties’ familial or intimate relationship, the court noted:
As noted above, the trial court rejected the applicability of the domestic violence exception, not because of insufficiency of evidence (the issue on which the court of appeal’s decision appears to turn), but because the accused and the victim were not living in an intimate relationship at the time of the incident. Because of this reasoning, the defense was precluded from introducing additional evidence of the intimate relationship. The court of appeal also suggested the requirement of a current intimate relationship. The statute, however, contains no such requirement. Indeed, such a requirement would be contrary to the purpose of the statute, which ‘was designed to provide a certain measure of relief for defendant in so-called battered wife cases,’ as well as for a broader category of accused persons. George W. Pugh et al, Handbook on Louisiana Evidence Law 307, Authors’ Note (4), Art. 404 A (1998).
A trial judge’s determination that a defendant has not laid a sufficient evi-dentiary foundation upon which to introduce testimony concerning the victim’s dangerous character will not be disturbed on appeal, absent a finding of clear error. State v. Jackson, 419 So.2d 425 (La.1981).
In the present case, the excluded evidence involved the testimony of Eric Din-kins, a college friend of Coleman’s. Coleman’s defense counsel began to question Dinkins about the nature of Coleman and Spinks’ relationship and an occasion in October 2009 when he was visiting Coleman at her apartment. The prosecutor objected on the grounds that the testimony failed to qualify under La. C.E. 404(A)(2). Coleman’s counsel explained that the purpose of the questioning was to establish that Coleman and thej^victim were in a romantic relationship in furtherance of introducing evidence of an incident that Din-kins saw involving the defendant and the victim. Counsel related that he expected Dinkins to testify that:
Mr. Spinks was walking up and down, appeared to be very upset. Mr. Spinks — according to the confrontation, she asked — Miss Coleman asked Eric to explain their relationship that they were just friends. He was going to do that. Brian Spinks stopped him. He stopped him and said, “I got no problem with you. I will deal with her later.” Then Eric told him “Look, I’m sorry there is *715 no romance going on here at all.” Again, Mr. Spinks makes the same statement, “I got no problem with you. I will deal with her later.”
During the extensive argument on this issue, the parties disputed the required showing of a “familial or intimate relationship” for the domestic violence exception. The prosecutor argued that the relationship must be “more than dating.” The prosecutor argued that the evidence in this case — that Coleman and the victim lived in separate apartments, that the victim was deployed through much of their relationship, that the defendant had her own car, job, money and place — did not support a finding of an intimate relationship. By contrast, the defendant cited evidence that Coleman had become pregnant by Spinks, that the defendant kept clothes at the victim’s home and that the two had a “schedule” for going out to clubs. The argument at trial on this point of law was extensive and spans almost 50 pages of trial transcript. The trial court discussed the Ro-drigue ruling and ultimately concluded that Coleman would not be allowed to present Dinkins’ testimony about the incident between Coleman and Spinks because of the lack of sufficient proof of an intimate relationship. At the time of the ruling, Coleman had not taken the stand.
121 As a further basis for the ruling, the trial court also concluded that the victim’s statement (“I will deal with her later”) did not sufficiently demonstrate “a history of assaultive behavior between the victim and the accused” required under the exception. The court considered that statement ambiguous. Counsel did not formally object to the ruling. Nevertheless, considering the length and passion of the defense argument, it is apparent that counsel disagreed with the court’s ruling.
Coleman, who relied in part on a theory of self-defense at trial, contends that she and the victim lived in an intimate relationship and that she should have been allowed to inform the jury of what she alleges was the dangerous character of the victim in accordance with the pronouncement in Ro-drigue.
From our review, the evidence is adequate to show that Coleman and the victim were involved in a romantic dating relationship as they conceived a child together and Coleman was known by friends as Spinks’ girlfriend.[9] Given the parties’ relationship, we find that the domestic violence exception could be applied. Nevertheless, we find no reversible error because of the trial court’s additional conclusion that Coleman failed to present evidence sufficient to establish a history of assaultive behavior by Spinks. Coleman concedes that the only independent and admissible evidence presented by the defense to establish that fact was the testimony of Dinkins who testified Dathat Spinks told him during a previous encounter that “I will deal with her [Coleman] later.” We agree that the statement was ambiguous. It does not substantially reflect any intention to place Coleman in reasonable apprehension of harm. Unlike the facts of Rodrigue, supra, Coleman offered no proof of either a police report or 911 call or other objective evidence indicative of assaultive behavior to document *716 the event. Given the broad discretion of the trial court on these matters, we conclude that the trial court did not err in rejecting the applicability of the domestic violence exception.
Moreover, we find no error in the trial court’s ruling regarding the admissibility of testimony from two psychologists and one sociologist relative to Coleman’s state of mind. Under La. C.E. arts. 404(A)(2) and (B)(2), the admissibility of expert opinion is limited “to the effects of the prior assaultive acts on the accused’s state of mind.” Thus, the introduction of such opinion evidence is contingent upon proof of prior assaultive acts. Coleman’s failure to produce such evidence also precludes the use of this testimony.
These arguments are without merit.
Coleman next argues that the trial court erred in granting the state’s reverse-Bat-son[10] challenge to three jurors, G.S., R.W. and K.K. The three challenged white male jurors were reseated by the trial court.
The record shows that jury selection in this case became contentious and the prosecutor first attacked Coleman’s use of peremptory challenges onjjgthe grounds that they were race-based and designed to strike white persons from the jury. At the time of the challenge, Coleman had exercised peremptory challenges against five white males, two white females and one black male. The white males were the principal focus of the argument. However, because of a comment by defense counsel during the Batson review, the exclusion of males over females became an additional focus by the trial court.
The background information for the three jurors returned to the jury was as follows:
Juror G.S. was retired, had been married for 34 years and had adult children. During voir dire, he stated that his only criminal conviction was a DWI at about age 21. His other experience with the legal system included being a witness in a civil lawsuit and his brother-in-law went to prison for a drug conviction. During individual voir dire, he said that he had heard about the case on television, but the information he heard would still allow him to afford the defendant a fair trial.
Juror R.W. was retired and had served in the Army in Vietnam. His only criminal conviction was for DWI in “about '71 or 2.” His other experience with the legal system was as a complainant in a harassing phone call case; a suspect had been arrested and was awaiting trial. He said that he took blood pressure medicine that “makes me a little dizzy, but not sleepy.” He also said that, when he was about six years old, his brother had served time in prison for car theft. Juror K.K. worked in industrial pest control. He said that he took medication for erratic heartbeat, but said that the medicine does not make him sleepy and his medical issue would not cause him a problem regarding jury service. He said that his brother had a DWI conviction “years ago.”
The following exchange occurred during defense counsel’s questions of juror K.K.:
Q: ... I was skipping you and I didn’t mean to. You seemed like you were getting kind of bored there, so I’m going to wake you up a little bit. What were you thinking about, fishing or what?
I24A: Exactly.
Counsel then engaged juror K.K. in a brief exchange about fishing.
At the time juror K.K. was excused, the defense had exercised peremptory chal *717 lenges against six men and two white females. Only one of the challenged jurors was African American. The prosecutor initially urged that the defendant was exercising peremptory challenges on the basis of race. The court, noting that Coleman and the victim were both black, found that the state had shown a prima facie ease that the defendant had exercised her peremptory challenges on the basis of race.[11]
The court then required the defendant to supply race-neutral reasons for the challenges, which were presented by defense counsel, as follows:
Juror G.S.: 21-year-old DUI conviction, “involved with a civil dispute,” and “I thought his answers indicated maybe he didn’t have a real full understanding of the some of the legal questions that I asked him.” Further, counsel said that he had a note about an unspecified medical condition. Counsel specifically stated, “we did not exclude him because he was a white male, Judge. We excluded him because we did not think he would give my client a fair trial.”
Juror R.W.: DUI conviction. Served in the Army; victim was a service member.
Notably during an unrelated argument in the middle of the race neutral reasons given for juror R.W., defense counsel made the following statements:
“Judge, also I strongly feel that my client is entitled to women on the jury, and that’s my intention is to try to keep women on the jury, try to give my client a fair trial, and I’m going to keep people off who might be prejudice^], particularly those involved in the military.”
|25At this point the prosecutor explicitly expanded his challenge to gender as well as race. Thereafter, the Batson colloquy continued:
Juror M.C.: Employment as a firefighter in a case where two witnesses were firefighters; counsel opined that the juror could not be fair and impartial.
Juror J.M.: Employed by a legal client of the prosecutor. Counsel did not want a juror whose livelihood was tied to the prosecutor.
Juror K.K.: On medication, and liked to fish. Counsel opined that he liked juror K.K. but thought his attitude was a little flippant about serving on the jury. Brother arrested for DWI, victim of petty theft.
The state responded to each of these arguments in turn and disputed the factual basis for Coleman’s assertions.
The trial judge proceeded to discuss the relevant law and its determination of the veracity of the defendant’s explanations for the peremptory challenges. The court found that the state’s prima facie showing of discrimination extended only to the five white males discussed above. The trial court then accepted Coleman’s explanation as to jurors M.C. and J.M. However, the trial court did not accept as genuine Coleman’s explanations for excusing jurors G.S., R.W. and K.K. The court quoted defense counsel’s statement that he wanted to keep women on the jury. The court then found Coleman’s explanation for juror G.S. (an old DWT and a question about his intelligence) to be pretextual. Similarly, the court rejected the reasons given for juror R.W. (DWI in 1971, served in the military) as pretextual, especially when he accepted other jurors with military service. Finally, the court rejected as pretextual the reason proffered for juror K.K. (medi *718 cal condition requiring medication) because he had not challenged other jurors whose | gijinedication had more of an impact on them than did juror K.K.’s. The court also. stated for the record that, as for the flippancy excuse, “the court did not find that to be the case whatsoever.” The court said that defense counsel was engaged in a “jovial exchange” with juror K.K. and that his attitude was “not flippant in any way.”
The trial court specifically stated:
[T]he court finds that there are three of them ... those three challenges were exercised on the basis of race and gender, that purposeful exclusion of white males in this case.
Accordingly, these three men were ordered to be reseated. The jury was ultimately composed of five white males, four white females and three black males.
In State v. Nelson, 10-1724 (La.3/13/12), 85 So.3d 21, the supreme court succinctly recited the law concerning the prohibition against the exercise of peremptory challenges based upon race:
In Batson, the United States Supreme Court held that the use of peremptory challenges to exclude persons from a jury based on their race violates the Equal Protection Clause. Batson, 476 U.S. at 96-98,106 S.Ct. 1712. The holding in Batson was initially adopted by this Court in State v. Collier, 553 So.2d 815 (La.1989), and has been codified by the legislature in Louisiana Code of Criminal Procedure article 795(C) and (D). While Batson discussed a prosecutor’s use of peremptory challenges, its holding is equally applicable to criminal defendants. See, Georgia v. McCollum, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992). The Court in McCol-lum specifically held “the Constitution prohibits a criminal defendant from engaging in purposeful discrimination on the ground of race in the exercise of peremptory challenges.” 505 U.S. at 59, 112 S.Ct. 2348, 120 L.Ed.2d 33. Further, in State v. Knox, this Court considered whether the State may successfully object during voir dire to a minority defendant’s alleged racially discriminatory exercise of peremptory challenges. 609 So.2d 803 (La.1992). We applied McCollum to hold that the State may invoke Batson where a black criminal defendant exercises peremptory challenges against white prospective jurors. Id. at 806. An accusation 127by the State that defense counsel has engaged in such discriminatory conduct has come to be known as a “reverse-Batson” challenge.
The Court in Batson outlined a three-step test for determining whether a peremptory challenge was based on race. Under Batson and its progeny, the opponent of a peremptory strike must first establish a prima facie case of purposeful discrimination. Second, if a prima facie showing is made, the burden shifts to the proponent of the strike to articulate a race-neutral explanation for the challenge. Third, the trial court then must determine if the opponent of the strike has carried the ultimate burden of proving purposeful discrimination. Batson, 476 U.S. at 94-98, 106 S.Ct. 1712.
Like race, gender is an impermissible basis for the exercise of peremptory challenges. J.E.B. v. Alabama ex rel. T.B., 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994).
We find no reversible error in the trial court’s ruling. Throughout its ruling, the court expressed serious concern over defense counsel’s statements regarding “tryfing] to keep women on the jury,” and at one point noted that these statements qualified as an intent to keep white males off of the jury and “to stack the jury with females.”
*719 In recent cases dealing with similar statements by counsel relating to race, the Louisiana Supreme court has held that such comments explicitly place race at issue.
In State v. Mason, 11-1866 (La.8/29/11), 68 So.3d 513, the state made a Batson challenge on the grounds of race. Defense counsel made a statement that he had to “burn up all of my peremptory challenges to balance out this particular situation.” The supreme court ultimately reseated two prospective jurors after concluding that counsel’s statements were an admission that race was a motivating factor in the exercise of his peremptory 128challenges and that counsel’s subsequent attempts to set forth racially neutral reasons for his decisions were pretextual.
In State v. Coleman, 06-0518 (La.11/2/07), 970 So.2d 511, the court ruled that the prosecutor’s statements that there was a black defendant and white victims “interjected the issue of race.” The court concluded that “once an inappropriate explanation invoking racial consideration is made, a subsequent, valid reason for exercising the peremptory challenge cannot purge the racial taint.”
Guided by these jurisprudential directives, we conclude that in this case, counsel’s statements to the court regarding his desire to keep women on the jury explicitly placed gender at issue. Like race, gender is an impermissible basis for the exercise of peremptory challenges. The trial court did not abuse its discretion in determining that counsel’s attempts to cure such references were pretextual.
This assignment of error is without merit.
In her last assignment of error, Coleman argues that the trial court’s denial of her motions to continue the trial constituted reversible error.
On November 2, 2011, Coleman was found competent to stand trial which was set for April 23, 2012. The following motions for continuance were made by defense counsel and denied by the court:
1) November 2, 2011-Coleman’s counsel, who had been newly enrolled on July 12, 2011, orally objected to the newly set trial date on the grounds that he needed more time to meet with Coleman, obtain expert witnesses and file pretrial motions and discovery.
The court denied the continuance specifically finding that the 6-month period until the trial date was “more than ample” time for counsel to prepare for trial.
|232) February 22, 2012 — -Written motion for a continuance filed. Coleman’s counsel re-urged his limited opportunity to visit with Coleman and desired that she be extensively evaluated by more mental health experts in preparation for the defense. The defense also requested a delay to secure the presence of Dinkins from Afghanistan and to review unseen photographs.
The trial judge denied the motion for continuance finding that counsel was “recycling the same old motion for continuance that I denied back in November” and that the six-month period which had now elapsed was ample time to prepare for trial. Ultimately, the court offered to allow the testimony of Dinkins by a computer-aided transmission.
3) April 10, 2012 — Second written motion to continue on the grounds that DNA testing and further investigation were required. In argument, Coleman urged as reasons for delay, ongoing discussions with medical experts, the need to contact additional witnesses and for additional DNA testing.
*720 The court again denied the motion for a continuance after concluding that additional delay would not assist Coleman in obtaining witnesses who were beyond the subpoena power of the court and that the defense had sufficient time to examine the previously provided materials and request additional information, if needed.
Coleman argues that she was forced to trial before she could be fully prepared and that her time for preparation was unreasonably short.
As this Court explained in State v. Maffett, 47,430 (La.App.2d Cir.9/26/12), 105 So.3d 138, writ denied, 12-2464 (La.4/12/13), 111 So.3d 1017:
The decision to grant or deny a motion for continuance rests within the sound discretion of the trial court, and a reviewing court will not disturb a trial court’s determination absent a clear abuse of discretion. La.C.Cr.P. art. 712; State v. Harris, 2001-2730 (La.1/19/05), 892 So.2d 1238, cert. denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005). Even when an abuse of discretion is shown, the supreme court typically declines to reverse a conviction based on denial of a continuance absent a showing of specific prejudice. State v. Harris, supra; State v. Hill, 46,050 (La.App.2d Cir.4/20/11), 64 So.3d 801, writ denied, 2011-1078 (La.11/14/11), 75 So.3d 940.
In the broadest view, Coleman had about 28 months to prepare for trial from the date of her arrest until the commencement of jury selection. Some of Isnthat time is arguably excludable due to the sanity proceedings, but that is also partly due to Coleman’s lack of cooperation with those proceedings. Even assuming that Coleman had sound reasons for changing counsel, her new counsel had the benefit of discovery taken by previous counsel and the period between July 2011 and April 2012 to prepare for the trial. Any additional DNA testing desired could have been accomplished long before the last-minute requests from defense counsel, and there is nothing in this record to suggest that additional testing would have changed the outcome of the proceeding or made any meaningful contribution to the evidence. Likewise, there is nothing to show that additional time to secure witnesses would have generated any further admissible evidence. For these reasons, we find no abuse of discretion in the trial court’s determination that continuances were not warranted. This assignment of error is without merit.

Decree

For the foregoing reasons, Coleman’s conviction and sentence are affirmed.
AFFIRMED.

. The forensic pathologist who testified indicated that Spinks’ moans on the 911 tape were made prior to his throat being slashed.

. The treating physician described Coleman’s wounds as minor, superficial lacerations, not stab wounds which travel into the body. Coleman required sutures on some of the wounds.

.Spinks’ autopsy revealed a blood alcohol level of 0.17 grams percent. The forensic pathology expert testified that Spinks was probably able to exercise only "a feeble attempt” at defending himself. Friends who were with Spinks confirmed his intoxication after a night of drinking at various clubs. Two of Spinks' friends drove him home and carried him into his apartment at about 3:00 a.m. because he was unable to walk on his own.

. A neighbor of Spinks told police that at about 3:15 a.m., she heard a female, that she identified as Spinks’ girlfriend, screaming, "I hate you, I hate you." She also heard Spinks state, "I know, I'm sorry.” The witness also told police that she then heard groaning.

. Coleman told another officer at the scene that the man's name was “Jason.”

. The state and defense experts who testified regarding Coleman’s mental state at the time of the crime offered differing conclusions about her sanity.

. The grand jury testimony of two unavailable witnesses confirmed Spinks’ intoxication and desire to leave the bar because of Coleman’s presence and an earlier incident where Spinks broke up a fight between Coleman and another woman by pushing Coleman away. Numerous character witnesses testified about Coleman’s reputation for peacefulness or provided evidence in support of the insanity defense.

. These rights are set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

. The Louisiana Dating Violence Act protects against dating violence and defines "dating partner" as "any person who is or has been in a social relationship of a romantic or intimate nature.” La. R.S. 46:2151. The existence of such a relationship shall be determined based on a consideration of the length of the relationship, the type of relationship and the frequency of interaction between the parties, but not living arrangements. Id. The Louisiana Supreme Court has yet to address whether the domestic violence exception in La. C.E. 404 includes dating violence.

. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

. No review of the prima facie showing of exclusion on the basis of gender was discussed. No argument is made on appeal, however, that the 6 to 2 exclusion rate of males over females was not a showing of gender bias.